# HOUGHTON, RECEIVER, *v.* BURDEN.

## APPEAL FROM THE CIRCUIT COURT OF APPEALS FOR THE SECOND CIRCUIT.

### No. 591.   Argued January 7, 1913.—Decided April, 7, 1913.

Where a secured creditor voluntarily comes into the Bankruptcy Court and asserts a claim to property in the trustees' possession, the proceeding is one in equity and the decree is reviewable by the Circuit Court of Appeals both as to law and fact; § 566, Rev. Stat., is inapplicable and the whole case is open under § 128, Judicial Code, and an appeal lies to this court under § 241, Judicial Code.

A contract for loaning money secured by accounts payable to the borrower, who is to act as agent for the lender in their collection, providing that the lender shall, in pursuance of a provision in a bond of indemnity given by third parties, examine the accounts and books of the borrower monthly and receive a compensation therefor equivalent to a specified per cent of the accounts remaining due, *held* in this case to have been made in good faith and not for the purpose of avoiding the usury laws, and not to be a usurious and void contract under the laws of the State of New York.

On an inquiry whether the contract is one forbidden by law, evidence dehors the agreement is admissible to show that, though legal on its face, the agreement is in fact illegal.

Usury may be interposed as a defense even though it contradicts the agreement.

Where the law of the state makes usury a crime, the burden is strongly on him who would avoid a debt on that ground; and where, as in this case, the borrower is supported by one witness who is in his employ and the lender is supported by one disinterested witness, the burden is not sustained.

THE facts, which involve the jurisdiction of the Circuit Court of Appeals to review facts in certain cases coming from the Bankruptcy Court and the construction of usury laws of New York, are stated in the opinion.

*Mr. Jacob B. Engel,* with whom *Mr. Jacob Jno. Lazaroe* was on the brief, for appellant:

The Circuit Court of Appeals having found that the court below had not committed any errors of law, should have affirmed the final order of the District Court. Section 566, Rev. Stat.; *Campbell* v. *United States*, 224 U. S. 99; *Rogers* v. *United States*, 141 U. S. 548; *Campbell* v. *Boyreau*, 21 How. 223.

Manifestly, if Burden had commenced an action on the facts recited in his petition, as he had a right to do, his only remedy would be an action at law for trover or conversion. Under no circumstances appearing in this record did his cause of action lie in equity; had the appellee attempted to frame his complaint in equity, he would have been defeated under the laws of the State of New York by the plea that he had an adequate remedy at law. *Bradley* v. *Aldrich*, 40 N. Y. 510.

A matter of the kind at bar is not a proceeding in bankruptcy, hence the exception made by § 566, Rev. Stat., does not apply.

Courts of Bankruptcy are given jurisdiction to try matters in controversy. Section 19, subd. c, clearly relates to the provisions of the Revised Statutes regulating trials by a jury. *In re Baudoine*, 101 Fed. Rep. 574; *In re Russell*, 101 Fed. Rep. 248.

The special master having found certain facts which were confirmed by the United States District Court, the Circuit Court of Appeals should not have reversed the judgment and order entered thereon unless the findings of fact were clearly erroneous or clearly against the weight of evidence. *Davis* v. *Schwartz*, 155 U. S. 631; *Kimberly* v. *Arns*, 129 U. S. 512; *Ohio Valley Bank* v. *Mack*, 163 Fed. Rep. 155.

The preponderance of evidence was in favor of sustaining the findings of the master. *Quackenbos* v. *Sayers*, 62 N. Y. 345.

That the real motive moving the parties was the giving and taking of an usurious rate of interest and not

of an employment is abundantly evidenced by the testimony.

No errors of law having been committed in the trial court its order and mandate should be confirmed.

Parol testimony can be introduced for the purpose of showing the real transaction between the parties and showing that the agreement, as drawn, was a mere subterfuge and made with the purpose and intent of evading the usury laws. *Mercantile Trust Co.* v. *Ginbernat,* 134 App. Div. 410; *Willmarth* v. *Hine,* 137 App. Div. 528; see also *Knickerbocker Life Ins. Co.* v. *Nelson,* 7 Abb. N. C. (N. Y.) 180, citing *DeWolf* v. *Johnston,* 10 Wh. 385; *Vilas* v. *McBride,* 62 Hun (N. Y.), 324.

This is the law throughout the country. *Massa* v. *Dauling,* 2 Str. 1243; *Scott* v. *Lloyd,* 9 Pet. (U. S.) 418; *Tucker* v. *Wilamonicz,* 8 Arkansas, 157; *Train* v. *Collins,* 2 Pick. (Mass.) 145; *Denyse* v. *Crawford,* 18 N. J. L. 325; *Grayson* v. *Brooks,* 64 Mississippi, 410.

The fact that the contract is in writing does not exclude oral evidence to show that though apparently innocent it was usurious. *Kohler* v. *Dodge,* 31 Nebraska, 238; *Rowan* v. *Hanson,* 11 Cush. 44; *Roe* v. *Kiser,* 62 Arkansas, 92; *McAleese* v. *Goodwin,* 69 Fed. Rep. 759.

In all instances of this character, as well as in the case at bar, the instrument is innocent and valid on its face and it is only by resort to extrinsic facts and circumstances that it is invested with the element of illegality.

A contract may not necessarily be usurious on its face; the burden is on the one contesting it upon the ground of usury to prove the guilty intention and that the contract was a cover for usury and for the loan of money upon usurious interest. *Rosenstein* v. *Fox,* 150 N. Y. 304.

On these questions oral, extrinsic and circumstantial evidence is freely received. *Thomas* v. *Murray,* 32 N. Y. 605; *Valentine* v. *Conver,* 40 N. Y. 248.

*Mr. John J. Crawford* for appellee.

MR. JUSTICE LURTON delivered the opinion of the court.

This is an appeal from a decree determining a controversy arising in a bankruptcy proceeding. The origin of the matter was this: Canfield, the bankrupt, was a merchant in New York. He borrowed from Burden the sum of $10,000, and as security assigned to him certain book accounts, aggregating the sum of $14,000, and agreed to act as agent for Burden in their collection. Shortly afterwards he was adjudicated a bankrupt. The receiver obtained possession of the bankrupt's books and held on to the assigned accounts and proceeded to collect them upon the claim that the contract was usurious and void under the law of New York.

In this situation Burden intervened in the bankruptcy case and filed a petition, in which he asserted his title to the assigned accounts and to any proceeds collected by the receiver. The District Court, upon a final hearing, upheld the contention of the bankrupt's receiver, now the trustee, and dismissed the intervening petition. This decree was reversed by the Circuit Court of Appeals, that court holding that the defense of usury had not been satisfactorily made out.

The appellant contends that the controversy having been heard by the district judge without a jury, the Circuit Court of Appeals had no authority to review the facts. For this, § 566, Revised Statutes, is cited, and also the case of *Campbell* v. *United States,* 224 U. S. 99, which construes that section. But that provision only requires that the trial of issues of fact in the District Court, except in cases in equity and admiralty, and except as otherwise provided in proceedings in bankruptcy, shall be by jury. But the District Court, is, by § 2 of the Bankruptcy Act of 1898, July 1, 1898, 30 Stat. 544, c. 541, when sit-

ting as a bankruptcy court, given jurisdiction in law and equity for the purpose of collecting and distributing the estate of a bankrupt, and for the purpose of determining controversies relating thereto, except as otherwise provided. The exception has no application here, as Burden voluntarily came into the bankruptcy proceeding and submitted his claim to the adjudication of the bankruptcy court. Such an intervention for the purpose of asserting a title or claim to property in the possession of the bankrupt's trustee is an intervention in equity and a decree is reviewable by appeal to the Circuit Court of Appeals in the exercise of its general appellate powers in equity cases under § 24–a of the Bankruptcy Act. Loveland on Bankruptcy, 4th ed., §§ 826 to 829; *Hewit* v. *Berlin Machine Works*, 194 U. S. 296, 300; *Knapp* v. *Milwaukee Trust Company,* 216 U. S. 545. Upon such an appeal the law and the facts are open for reconsideration, and from the decree of the Circuit Court of Appeals, it not being final (§ 128, new Judicial Code), an appeal may be taken under § 241 of the same code.

Being an appeal from a decree in a controversy arising in a bankruptcy proceeding, and therefore, an appeal under § 24–a, and not under § 25–b, General Order XXXVI made under the latter section and requiring a finding of facts, has no application, and the appeal opens up the whole case as in other equity cases. *Hewit* v. *Berlin Machine Works,* supra; *Coder* v. *Arts*, 213 U. S. 223, and *Knapp* v. *Milwaukee Trust Co., supra.*

Coming now to the merits. The single question is one of usury in the contract. The lawful rate of interest in New York is 6 per cent. By § 373 of the General Business Law of New York it is provided:

"All . . . contracts whatsoever . . . whereupon or whereby there shall be reserved or taken or secured, or agreed to be reserved or taken any greater sum or greater value for the loan or forbearance of any money,

goods or other things in action, than as above prescribed,
shall be void."

   Canfield was a reputable merchant engaged in business
in New York.  Burden was a retired merchant and an
experienced accountant, who wished to secure light em-
ployment.  To secure such employment he advertised
that he would lend from $10,000, to $20,000, at 6 per cent.
to a merchant whose rating was good, if the loan would
secure such employment.  Through a broker, compen-
sated by Canfield, negotiations were opened with Burden,
who proposed the loan provided he could get light em-
ployment in Canfield's office as a financial man.  But the
financial statement of Canfield exhibited to Burden was
nearly a year old, and this did not satisfy Burden, and
the negotiations fell through partly for that reason, and
partly because the parties could not agree upon the posi-
tion Burden desired.  Some weeks later the negotiations
were resumed, the broker saying that he might get addi-
tional security through an indemnity bond, by which
the validity of the book accounts which were agreed to be
assigned might be guaranteed as well as the payment of
collections made by Canfield as agent.  Canfield agreed
to furnish such a bond.  The proposed bond required the
obligee to watch the shipping receipts and to make monthly
minute examinations of Canfield's books, showing the
several assigned accounts.  Finding this requirement to
be a condition of such a bond, Burden demanded that he
should be compensated for the service he would be re-
quired to render to keep the bond in force, and a compensa-
tion of one per cent. per month upon the amount of the
uncollected accounts at the end of each month was agreed
upon.  Thereupon the contract in question was executed,
a bond of indemnity was given to Burden and something
like 100 accounts aggregating about $14,000 were duly
assigned, upon which an advance of $10,000 was made.

   The contract is elaborate and too lengthy to be set out

in full.  In substance it provided for a loan of. $10,000 at 6 per cent. upon assigned accounts against reputable merchants, the loan not to exceed 75 per cent. of the face value of the accounts.  Canfield agreed to act as Burden's agent in collecting and to guarantee the payment of each account so assigned.  The contract also provided that after the payment of the money borrowed and interest, and costs and expense of collection and the compensation to Burden for his services as required by the bond, the remaining accounts should be re-assigned to Canfield. The clause in regard to this compensation gives rise to the claim of usury.  It was in these words:

"The party of the second part shall be entitled to compensation for the labor and services to be performed, and time to be expended, by him in making the examinations required by the terms of the bond executed by the Fidelity and Casualty Company of New York, and delivered simultaneously herewith, which compensation is to be measured by computing one per cent. per month upon whatever part of the advance shall remain uncollected on the said accounts, and for the period that the same shall remain so uncollected."

The indemnity bond styled an "Assigned-Accounts bond" is in the usual form and is undoubtedly a device resorted to, to enable merchants to use book accounts as collateral for money advanced or loaned.  The principal condition was in these words:

"The Obligee shall require the Principal to state in writing at the time of assigning each account, the date when the payment of such account is due, and if the payment of any account is not made within twenty days of the date that such payment is due, the Obligee shall immediately thereupon make demand by registered mail upon the debtor for the amount due.  The Obligee shall require the Principal to file with the Obligee in connection with each account a certificate signed by a responsible

official or employé of the Principal stating that the account referred to in the certificate represents a bona-fide sale, and that the merchandise concerned with the account has, prior to signing of the certificate, been shipped to the customer named in the account. The Obligee, at least monthly, shall make an examination of the accounts of the Principal which shall embrace—(1) a complete examination of the books, accounts, and vouchers of the Principal as respects the accounts covered under the said agreement; (2) a strict comparison between all unpaid accounts as such accounts appear on the records of the Obligee and as such accounts appear in the books of original entry of the Principal."

That this contract upon its face is absolutely legal there can be no serious doubt. A material part of the security which Canfield proposed to give was the bond by which the collection of 75 per cent. of the face value of the assigned accounts was guaranteed, to the extent of $7,500, as well as that Canfield would promptly pay over any money and checks collected by him as agent for Burden. But a condition of this security was that the obligee should keep a watchful guard over the accounts assigned and make monthly inspection of the books of Canfield. That this would necessitate several days work each month, if actually done with fidelity, is clearly shown. That little service was rendered under this provision aside from the examination of the accounts and shipping receipts as they were assigned at different times, was due to the bankruptcy ensuing within a very short time and the seizure of the bankrupt's books by his receiver.

The contention is that this provision for compensating Burden for the service required by the indemnity bond was a mere cover for unlawful interest, and that it was never intended or expected that any such service would be given. This is sought to be shown by alleged oral declarations of Canfield. Thus, Canfield says that when

he was about to sign the contract he asked Burden what the clause about services to be rendered meant, and that he replied, "that that was simply to get around the usury law; there were no services to be rendered at all." Canfield's bookkeeper, a Miss Herzog, after saying that in the negotiations prior to the day the agreement was signed that she had heard Burden say that he must have a bonus of one or two per cent. a month as usury, testified as to what she overheard through an open window between her office and that occupied by Canfield at the time the bond was signed, as follows:

"Q. Isn't it a fact that Mr. Canfield asked Mr. Burden what was meant in this agreement concerning services and charges for services to be rendered by Mr. Burden?

"Mr. Crawford. Objected to as leading.

"The Referee. Sustained.

"Q. What did you hear Mr. Canfield say concerning this agreement shown you. A. I don't remember.

"Q. Well, did Mr. Canfield say anything about services or did Mr. Burden say anything about services to be rendered? A. Well, Mr. Burden said he would like to have about an hour's work to do in our establishment every day, and then Mr. Canfield told him we would not have any use for him there."

Burden when recalled testified to his good faith, and that the compensation agreed upon was to be for the service required by the contract and bond and would be worth what he was to receive. He denied in most emphatic terms that he ever demanded a bonus or used the word usury in any of the negotiations, or that he had ever made any such statement or declaration as testified to by Canfield. He was supported in his denial by Koehler, the broker who negotiated the loan for Canfield. All of this evidence was excepted to as contradicting the written agreement and was admitted over objection. Where the inquiry is whether the contract is one forbidden by law,

it is open to evidence dehors the agreement to show that though legal upon its face it was in fact an illegal agreement. Otherwise the very purpose of the law in forbidding the taking of usury under any cover or pretext would be defeated. The defense is one which the debtor may make even though it contradicts the agreement. *Scott* v. *Lloyd*, 9 Pet. 418.

It has been suggested that there is a distinction between the admissibility of evidence dehors the contract which is intended to show the whole and true nature of the transaction and mere declarations made by the lender in the nature of a confession that the agreement for services required to maintain the obligation of the indemnity bond was a mere scheme to cover usury, and that no service was to be rendered. We notice the distinction and pass it by, for the reason that assuming the evidence to be competent, it is not so convincing as to justify a disagreement with the view of the Circuit Court of Appeals that the defence of usury has not been satisfactorily made out.

The instrument upon its face is not usurious. Of course, if the service to be rendered should be made to appear trivial and of no real importance, the inference might be drawn that the agreement in that particular was a sham and device to cover a mere usurious contract, such as we are asked to believe Burden declared it to be. Burden's plan was that the loan should carry with it light work, such as a retired business man might do,—one or two hours of office work each day, as he explained. But he also requested security for his money. Open book accounts might answer if the borrower had a satisfactory business rating. The latter means everything to business men. Canfield's rating was not late enough to satisfy Burden and the negotiations fell through, and were not resumed for a month or more. Then Koehler, who had before negotiated loans for Canfield, suggested that he should also

give Burden the indemnity bond. Burden examined the form of such bond, and finding that one of its conditions was his own watchfulness over collections and minute inspections of Canfield's books, he proposed to make the loan upon the assigned accounts and the indemnity bond, provided he was compensated for the service the bond required from him. The amount agreed upon, Burden claims, was no more than a fair return for what Judge Hand, who in the District Court sustained the defense, describes as "work which was undeniably substantial and vexatious."

To hold the agreement void would seem to require that we shall accept as true that there was no such service expected or required, and that the clause was inserted to cover a usurious bonus. But as the indemnity bond was conditioned upon Burden doing the very things which he is said to have declared were not to be done, of what value would that security become? The natural presumption is that Burden was endeavoring to put his contract in such shape that Canfield could not defeat his obligation by the defense of usury. Yet we are asked to believe that he deliberately declared to the debtor that the agreement as to services was a device to defeat the law, and that he was not to render any such service. The incredibility of such a declaration by Burden to Canfield the debtor seems obvious. Upon this point Judge Coxe, for the Circuit Court of Appeals, said:

"Of course bankruptcy was not contemplated at that time, at least by Burden. If Canfield did not enforce the usury law Burden had nothing to fear. If the agreement did not bind Canfield, it did not bind anyone and yet Burden, if this testimony be true, made it absolutely useless to accomplish the object for which he says it was signed.

"Why should Burden make an agreement to enable him to receive usurious interest and at the same time make it

impossible for him to take such interest without placing him absolutely at the mercy of Canfield?

"There is no pretense that Burden was *non compòs mentis* at the time, and yet it is difficult to believe that any rational being would have gone to the trouble and expense of having this elaborate agreement prepared for the purpose of avoiding the usury law and at the same time admit to the only man who could interpose the defense of usury that it was a void agreement. So far as the validity of the agreement is concerned, Burden might as well have stamped in red ink on its face the words, ' void for usury.'

"We must assume that Burden is a man of ordinary common-sense, but in order to find that he made the statement quoted, we must convict him of stupidity which is unique in its originality. It is difficult to imagine that a rational being would procure a safe to protect him from burglary and immediately send the 'combination' to the burglar whom he had most reason to dread."

Canfield is supported by his bookkeeper, though her account of the matter is materially different from his. Burden is supported by Koehler, the broker, who was in the negotiations throughout, and so far as appears, absolutely disinterested. There are two witnesses against two, and the burden to make out the usury is strongly upon the appellant. *Stillman* v. *Northrup*, 109 N. Y. 473, 478; *White* v. *Benjamin*, 138 N. Y. 623, 624. In the case last cited, it was said:

"Usury is a crime and he who alleges it as a defense to an obligation must establish it by clear and satisfactory evidence."

This the appellant has not done.

*Decree affirmed.*

MR. JUSTICE PITNEY dissents.