JAMES BRADFORD COMPANY,

*vs.*

UNITED LEATHER COMPANY.

*New Castle, Sept.* 14, 1914.

As a receiver of the estate of an insolvent corporation acts for all creditors, it is his right and duty to question a transaction whereby the insolvent borrowed money, paying an alleged usurious rate of interest.

A borrower, who pledged accounts receivable as collateral to secure its loans, agreed with the trust company making the loan that the lender should, as compensation for its services in connection with keeping the accounts and collecting the collateral, receive $125 per month. The accounts at first were numerous, but when they became less the trust company voluntarily reduced the compensation. *Held*, that, though such compensation was in excess of the six per cent. interest allowed by *Rev. Code* 1915, *c.* 77, §§1, 2, the agreement was not usurious, for the services were substantial, and though performed by an officer of the trust company, no new agent having been engaged, the company was entitled to compensation, just as an individual would be.

Where the taking of compensation by the lender for services rendered to the borrower is relied upon to show usury, the decision depends on the facts in each case, and the test is the reasonableness of the amount and the intent of the parties.

Where there is a contract whereby money is loaned and payment thereof secured by book accounts payable to the borrower, who is to act as agent for the lender in the collection of the accounts, and the lender receives, in addition to the full legal rate of interest, compensation for the work done by him in examining the books and keeping a record of the accounts of the borrower in order to protect the interests of the lender, the agreement is not usurious if made in good faith and not to avoid the usury law, and the compensation be reasonable in amount proportionate to the work done.

STATEMENT OF THE CASE. Receivers having been appointed for the United Leather Company on the ground of its insolvency, it was found that certain book accounts representing sales made by the company of leather had been assigned

by it as collateral security for notes made or indorsed by it and held by the Security Trust and Safe Deposit Company. In order to facilitate the collection of these accounts an amicable order was made allowing the trust company to continue to collect them and hold them subject to the order of the Chancellor. Later the receivers filed a petition to obtain payment to them of the amounts so collected, to be administered in the course of the receivership.

By its answer to the petition the trust company alleged, among other things, that on or about November, A. D. 1912, it made an agreement with David L. Levy, president of and representing the said United Leather Company, to loan the said company then and from time to time thereafter, money on its promissory note or notes payable on demand, with an assignment by it of accounts for money due from other persons and corporations for leather sold, to the amount of eighty per centum of the face value of said accounts, as collateral security and a pledge for the payment of said note or notes. The said United Leather Company proposed and agreed to pay to the trust company the sum of $125 per month, which amount it was agreed was to provide clerical services in keeping the record of said accounts so assigned, the payments made thereon from day to day, auditing the same with the books of the United Leather Company, and the collection of the money due on said accounts.

The United Leather Company further agreed to make good any of said accounts so assigned and unpaid at maturity by the payment thereof in cash, or by the substitution of other accounts in lieu thereof, the trust company agreeing to account to said United Leather Company for any amounts received by it in payment of any of said accounts in excess of the amount loaned thereon, reserving the right to apply said amounts to the payment of any note or notes held by it and secured by any account which was unpaid at maturity.

At the hearing of the petition oral testimony of witnesses was heard. It further was shown that at the time the agreement was made the trust company held notes of the Leather Company; that between December 8, 1913, and August 14, 1914,

a. period of about eight months, 26 notes were taken by the trust company, some of them being renewals, and 405 accounts, aggregating about $93,000 were assigned as collateral; that the moneys due on the accounts were in the first instance paid to the Leather Company and by it paid to the trust company as received; that to protect itself it was necessary for the trust company to keep a record of the assigned accounts, the payments made thereon, the goods returned by the purchasers, involving disputes as to the amounts payable by the debtors by reason of mistakes as to the quantity and quality of goods shipped, and other questions between the Leather Company and its customers, and also requiring the examination of the books of the company relating to the accounts; that this service required the attention of an officer of the trust company, in addition to his other duties, for about two hours every day, and every two or three weeks an examination of the books of the Leather Company, but that no extra clerk was employed, or any particular expense incurred by the trust company for the work so done. It further appeared that the arrangement was made at the request of the president of the Leather Company, and was voluntary and without pressure, and there was no testimony showing directly any intention to avoid the statute as to usury, other than the making of the agreement above mentioned, if that be sufficient. It also appeared that as the number of accounts diminished the amount of compensation taken by the lender was lessened substantially, though it had a right to a fixed sum per month independent of the number of accounts so handled.

*Richard S. Rodney,* for the petitioners.
*Benjamin Nields,* for Security Trust and Safe Deposit Co.

THE CHANCELLOR. The questions of law raised in the proceeding and discussed are two: (1) Whether the agreement was usurious under the statute in existence prior to March 8, 1915, being *sections 1 and 2 of chapter 77 of the Revised Code of 1915,* viz., *sections 2621 and 2622;* and (2) if it was so usurious, whether the repeal of the above sections of the statute by the

Act approved March 8, 1915, being *chapter* 213 *of volume* 28, *page* 631, *Laws of Delaware*, rendered the agreement enforceable.

It is the right and duty of a receiver, or other fiduciary, to raise the question as to the validity of the agreement, for he acts for all who have interests against the borrowing company, and is, therefore, in a different position in this court, in this proceeding, from a borrower who seeks the aid of a court of equity against the lender on the ground of usury (27 *Am. & Eng. Encyc. of Law* [*1st Ed.*] 954, *note* 8; *Id.* 955, *note* 1; 39 *Cyc.* 1066); and the principles stated in *Ennis v. Ginn*, 5 *Del. Ch.* 180, do not apply.

In view of the conclusions as to the first question it is not necessary to consider the other one. The statute in force at the time of the transactions in question is as follows:

"The legal rate of interest is six per centum per annum; and if any person shall directly, or indirectly, take for the loan, or use of money, more than six dollars, for the loan, or use, of one hundred dollars, for one year, and in that proportion, he shall forfeit and pay, to anyone who will sue for the sum, a sum equal to the money lent, one-half for the use of the person so suing, and the other half for the use of the County where suit is brought."

Although this question has not been decided in this State, the statute which for many years has been in force here has been frequently construed. It has frequently been said that no ingenuity will be allowed to avoid the statute, and that the taking directly, or indirectly, of a higher rate of interest than six per cent. per annum is usury. In *Newport Nat. Bank v. Tweed*, 4 *Houst.* 225, 231, the court said:

"In no case where there is a lending of money in which the person lending it, either directly or indirectly, takes or contracts for the loan or use of it at a higher rate of interest than six per cent. per annum, can the wit of man devise a plan to cover and conceal it, that the Court would not unkennel and expose the usury of it, and enforce the statute against it."

Frequently it has been held here that the usurious contract is void, and therefore unenforceable. *Cook v. Pierce*, 2 *Houst.* 499; *Calley v. Erb*, 4 *Houst.* 319; *Cleaden v. Webb*, 4

*Houst.* 473, 485; *Newport National Bank v. Tweed, supra.* It is usury for the lender to share commissions paid the lender to a broker. *Calley v. Erb, supra.*

It is frequently asserted that whether a contract is usurious or not depends on the intention of the parties. This is not literally true. All that is really meant is that if one voluntarily takes, or by agreement is entitled to take, interest or compensation for the use of money in excess of the legal rate, the transaction is usurious. If taken by mistake, or accident, it may not be usurious.

In *Elliott on Contracts, vol.* 2, §967, the law is thus expressed:

"The voluntary taking or reservation of a greater interest or compensation for the loan or forbearance of money than that allowed by law is *per se* usurious, but if taken by mistake or accident it is not usury. If the party intends to take and receive the amount paid, the law condemns the act if it is within the condemnation of the law against usury. It is the substance and effect of the transaction which controls and not its form. Every agreement to pay interest in excess of the legal rate, however well the unlawful intent may be disguised, is a violation of the law and usurious. When it is made to appear that the transaction is a mere scheme or device to evade the usury laws it follows within the prohibition of such laws."

It was not contended by the solicitors for the receivers that the agreement to pay for services rendered by a borrower to a lender, or the payment thereof in addition to the highest legal rate of interest, is necessarily usurious; but it is urged that the amount thereof must be reasonable, and must be given and taken in good faith and not as a cloak for an illegal action; and further, that there must have been expenses actually incurred. In this matter it is urged that the charge was so grossly excessive as to make the agreement usurious. It does not constitute usury if the borrower pay the cost of examination of title to premises mortgaged and of the preparation of legal papers in connection therewith. 39 *Cyc.* 981. The general principle as to the effect of charges for services rendered by a borrower to a lender is thus well stated in 39 *Cyc.* 931:

"In general, the circumstances attendant upon the making of a loan may require many kinds of services to be rendered to the borrower by the

lender, or his agent. For such services rendered in good faith the lender may properly require of the borrower a reasonable compensation in addition to the highest legal rate of interest upon the money loaned."

To like effect see *Tyler on Usury, p.* 335, as cited by the solicitors for the receivers.

Where the taking of compensation by the lender for services rendered to the borrower is relied upon to show usury, the decision depends on the facts in each case, and the test is the reasonableness of the amount. One case cited was helpful, for the question was similar, though in some important respects they were different, viz., *Houghton v. Burden,* 228 *U. S.* 161, reported under the name of *In re Canfield,* in 190 *Fed.* 266, in the United States District Court, and in 193 *Fed.* 934, in the United States Circuit Court of Appeals on appeal. In that case Burden, the lender, had loaned money to Canfield with bills payable as collateral, and it had been agreed that Burden should keep account of the bills, Canfield to receive the payments and remit to Burden, and that Burden should notify Canfield whenever there was a default in remittances by Canfield to Burden, and Burden would also examine the books and vouchers of Canfield monthly and compare the statements rendered by Canfield to him with the books of original entry. It was considered that this work would take five or six days every month, while the letters to overdue debtors would be an added labor. There were ninety-eight accounts. The bankruptcy of Canfield soon terminated the plan, and the question was whether the agreement for the compensation made the contract usurious, inasmuch as the lender would have received $1,200 for these small services for a loan of $10,000. Canfield also gave Burden a bond guaranteeing payment, and it was part of the duty of Burden under the bond to examine the accounts of Canfield monthly. When Canfield became bankrupt the trustee repudiated the arrangement, and the question was whether it was usurious. In the District Court Judge Hand held the contract usurious, the compensation being too large for the services rendered, although the work was, as he said, "undeniably substantial and vexatious." On appeal

Judge Coxe reversed the court below, regarding the compensation not excessive and the work he agreed to do was worth "a substantial compensation." The Supreme Court sustained the Circuit Court of Appeals, and held that there was no serious doubt as to the absolute legality of the contract on its face. Much importance was attached to the fact that the lender was required to do certain work by the terms of the bond of indemnity which was given to him, and the court expressly said that his compensation was no more than a fair return for the work which he was so called on to do. There being no illegality on the face of the contract and no proof of want of good faith, the contract was upheld. This case may be distinguished in some points from the case at bar, but in the main it is an authority of weight to support the following rule:

"Where there is a contract whereby money is loaned and payment thereof secured by book accounts payable to the borrower, who is to act as agent for the lender in the collection of the accounts, and the lender receives, in addition to the full legal rate of interest, compensation for the work done by him in examining the books and keeping a record of the accounts of the borrower in order to protect the interests of the lender, the agreement is not usurious if made in good faith and not to avoid the usury law, and the compensation be reasonable in amount proportionate to the work done."

Applying the rule here, it is clear that there is nothing to disprove good faith of the parties, and the testimony does not clearly show that the compensation to the lender was so disproportionate to the services to be rendered as to be of itself evidence of bad faith, or as showing it was a subterfuge to evade the statute, or so inequitable as to be oppressive. The number of accounts was large and keeping a record thereof and payments thereon involved care and skillful attention. It was a liberal compensation, but not a seriously excessive one. One feature of it was subject to adverse comment, viz., the compensation agreed on was for a fixed sum per month even if the service rendered was lessened by a reduction in the number of accounts pledged. But the force of this objection is lessened by the fact that the trust company voluntarily reduced its compensation as the work was lessened during the

latter part of the time, and this also shows the good faith of the transaction. Being convinced then that the compensation to the lender, though large, was not unreasonable, the contract was not rendered unenforceable because the compensation was received.

The fact that no extra clerk was employed by the trust company to keep a record of the transactions does show that the compensation was disproportionate to the value of the service rendered. The question is to be considered as though the transaction was between individuals and not between corporations. As the lending company used its employes to perform the labor it is entitled to be paid therefor as though the service had been rendered by an individual lender. The contract is not rendered illegal because the lender was not put to actual expense for the services rendered, for that would render invalid such a contract if the lender as an individual rendered the service himself and received compensation therefor. No authority was cited to support the contention that the lender could not legally receive more than expenses actually incurred, and on the contrary payment for services rendered by the lender to the borrower has in other cases been considered proper.

Inasmuch as the trust company by the valid pledge of the book accounts is entitled to the proceeds thereof, which are less than the amount of its claim against the pledgor under the pledge, it will be entitled to retain the moneys received pursuant to the contract, and the prayer of the petition is denied.