### In re LIBERTY DOLL CO., Inc.

(District Court, S. D. New York. May 7, 1917.)

1. DAMAGES ☞79(1)—LIQUIDATED DAMAGES OR PENALTY.

By an agreement between claimant and the bankrupt, a corporation, claimant was to make advances for labor and material on orders received by the bankrupt acceptable to claimant, to whom the bankrupt was to assign all accounts receivable for merchandise covered by such orders, the merchandise itself, etc. Claimant agreed to supervise the collection of all accounts so assigned, to advise as to the credit and financial responsibility of the bankrupt's accounts, assist in the bankrupt's credit department, and perform all such other services usual in its business. At its option the advances might be applied directly in payment for labor or materials. The bankrupt was to pay interest on daily balances, and, in addition, though advances were to be made only on orders acceptable to claimant, and it was therefore not obligated to make any advances, it was to be paid a commission of $2,500 for its services until orders or accounts receiv-

---

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

able amounted to $100,000 a year, when it was to be paid a commission of 2½ per cent. It was also to be paid all actual disbursements and reasonable attorney's fees. *Held* that, while the contract was not usurious, because the' bankrupt, being a corporation, could not plead usury under the state law, it was unconscionable, and the provision for the payment of $2,500 was in the nature of a penalty, as there would be no difficulty in ascertaining the value of the services actually rendered.

[Ed. Note.—For other cases, see Damages, Cent. Dig. § 164.]

2. DAMAGES ☜80(1)—LIQUIDATED DAMAGES OR "PENALTY."
Where the sum agreed upon as liquidated damages is so great as to be unconscionable, it will be regarded as a "penalty."

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 170–172.

For other definitions, see Words and Phrases, First and Second Series, Penalty.]

3. DAMAGES ☜80(1)—LIQUIDATED DAMAGES OR PENALTY.
Where the amount stipulated as liquidated damages is disproportionate to the presumable and possible damages, or to a readily ascertained loss, it will be treated as a penalty.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 170–172.]

4. CHATTEL MORTGAGES ☜115—ATTORNEY'S FEES—RIGHT TO ATTORNEY'S FEES.
Under a chattel mortgage given as additional security for advances under a contract providing for the payment of all of the lender's disbursements or expenditures and all reasonable attorney's fees, where the lender was compelled to defend the validity of the mortgage in bankruptcy proceedings, it was entitled to a reasonable attorney's fee.

[Ed. Note.—For other cases, see Chattel Mortgages, Cent. Dig. §§ 190, 191.]

5. BANKRUPTCY ☜474—COSTS—REVIEW OF REFEREE'S ORDERS.
Where, on the trustee's motion for review of an order of the referee in favor of another litigant, neither party was wholly successful, the disbursements should be taxed equally against the trustee and such litigant.

[Ed. Note.—For other cases, see Bankruptcy, Cent. Dig. §§ 878–884.]

In Bankruptcy. In the matter of the Liberty Doll Company, Incorporated. On review of an order of the referee, directing the trustee in bankruptcy to pay to Levison & Co. $2,412.61, and $250 for the fees and disbursements of their attorney, aggregating in all $2,662.61. Order modified.

On February 14, 1916, Levison & Co., as party of the first part, entered into a written agreement with the bankrupt corporation, as party of the second part. For the convenience of those interested in the principal question involved, the essential features of the agreement are herewith quite fully set forth.

"First. The first party hereby agrees to advance unto the second party * * * such sums of money as may be required by the second party for the purpose of paying for labor and material on orders received by the second party in its business, provided such orders are acceptable to the first party as security, and in such event the first party agrees to advance to the second party an amount on each order not exceeding fifty (50%) per cent. of the selling price indicated therein. Upon delivery and acceptance of merchandise, and the assignment to first party of the account receivable created thereby and delivery of invoices therefor, first party will make a further advance of 25% of the amount of invoice; it being the intention that the total advance under any account receivable shall not exceed 75% of the net amount thereof.

"Second. The second party agrees to execute * * * and deliver unto the first party an assignment * * * of all the accounts receivable there-

after to be created by reason of the delivery and acceptance of the merchandise provided for in said orders, together with all moneys due and to grow due thereon.

"Third. And in order to carry out the intents and purposes of the agreement between the parties hereto, the second party has agreed to, and * * * does hereby, sell, assign, transfer, and set over unto the first party all such orders upon which the first party shall hereafter make advances, as hereinbefore provided, and of all the moneys due and to grow due thereon, * * * and does hereby sell, assign, transfer, and set over unto the first party each and every account receivable created by the delivery and acceptance of the merchandise covered in each such order, and of the moneys due and to grow due upon each such account receivable, and does hereby sell, assign, transfer, and set over unto the first party all and each and every article of merchandise used or to be used in the filling of any order upon which the first party shall have made advances and which shall have been assigned as hereinbefore provided for, including raw material and finished article, and such merchandise used in the orders above provided for shall at all times be and remain the property of the first party herein until actually delivered to and accepted by the customer giving such order, and, should such customer reject or return said completed merchandise, such rejected or returned merchandise shall at all times be and remain the property of the first party herein, wherever the same may be situated, and shall so remain the property of the first party until any and all advances made by the first party to the second party shall have been fully liquidated and discharged. Such returned merchandise may be reshipped or redelivered, and in such event the accounts receivable created thereby shall be immediately assigned to the first party as additional collateral, and the same are hereby so assigned.

"Fourth. The first party agrees to supervise the collection of all accounts assigned to them, and to use due diligence in the collection thereof, but they shall not be liable for any failure to collect provided the first party has used such diligence, to issue statements and draw drafts as and when necessary, to advise as to the credit and financial responsibility of the accounts of the second party and to assist in the credit department of the second party, to open and keep accurate and true books of account concerning the accounts transferred and assigned to it, and render unto the second party reports of collection and credits, and to perform all such other services usual in the business of the first party.

"Fifth. The advances to be made by the first party of fifty (50%) per cent. of the amount of any order, as above provided for, shall, at the option of the first party, be either turned over unto the second party, or be applied by the first party to the payment for materials to be used in the filling of such orders and the payment of labor to be employed therefor. Invoices for materials and merchandise purchased for the filling of such orders are to be submitted to the first party for payment and the weekly pay roll for labor for such purpose to be submitted on Saturday of each week, and the same to be paid by the first party.

"Sixth. All checks received by the second party in payment of any assigned orders, or accounts receivable, shall at all times be and remain the property of the first party, and upon receipt thereof by the second party the identical checks so received shall immediately be delivered to the first party, and the first party is hereby authorized and empowered by the second party to indorse such checks in the name of the second party, if need be, and to indorse or sign any receipts, warrants, notes, checks, or drafts, or any other negotiable instruments received in payment of such accounts receivable. And the second party does hereby constitute and appoint first party its attorney irrevocable, for it and in its name, place, and stead, or in the name of the first party, and at the cost and expense of the second party, to ask, demand, receive, collect, compromise, sue for, and institute and complete any actions or proceedings whatsoever for the collection of any moneys due upon orders or accounts receivable assigned as aforesaid.

"Seventh. The second party agrees to pay in full and liquidate each and

every advance, whether made upon orders or accounts receivable, within a period of ninety (90) days from the date of such advance.

"Eighth. All sums received from the collection of accounts assigned shall be applied by first party to the credit of second party's account, allowing interest thereon at the rate of six (6%) per cent. per annum, and second party agrees to pay interest at the rate of six (6%) per cent. per annum on all daily balances against it. The equity of 25% in each account receivable when paid shall be applied to the repayment of any advances then remaining unsecured except by assignment of orders; when such advances have been fully liquidated, then such equity shall be paid to second party upon demand.

"Ninth. The second party agrees to pay unto first party, for the services to be rendered by first party, a commission of twenty-five hundred ($2,500) dollars, same to be paid in advance, and such sum to be in full payment of all of the first party's services and commissions until the gross amount of orders or accounts receivable upon which the first party shall have made advances shall have amounted to one hundred thousand ($100,000) dollars in each year; said commissions to be paid in any event, regardless of the amount of gross orders or accounts receivable assigned upon all advances made in excess of the said sum of one hundred thousand ($100,000) dollars in any year. The second party agrees to pay unto the first party a sum equal to two and one-half (2½%) per cent. of the gross amount of orders or accounts receivable assigned to the first party. In addition thereto, the second party agrees to pay to and reimburse the first party for any actual disbursements or expenditures, such as postage, exchange on checks, all reasonable attorney's fees and disbursements incurred, if necessary, in the collection of any accounts receivable, or in any other matter made necessary by reason of any of the provisions of this contract.

"Tenth. The second party agrees to pay to the first party, upon demand, the invoice value of any returned merchandise or the amount of any assigned account past due for fifteen days, or the amount of any account, the debtor of which shall have become insolvent. Such accounts shall, however, continue to be held by the first party as additional security for any indebtedness then due from the second party.

"Eleventh. In the event of any default in the terms hereof, or of any misrepresentation concerning any assigned account, or any misrepresentation in regard to any matter pertaining to this agreement, or in the event that the second party becomes insolvent, or makes an assignment for the benefit of creditors, or if bankruptcy proceedings be instituted against it, or a petition be filed by it, or if any judgment be entered against the second party and remain unpaid for a period of thirty days, all indebtedness of the second party to the first party then outstanding shall immediately become due and payable to the first party upon demand.

"Twelfth. All collateral coming into the possession of the first party shall at all times be and remain as collateral for any liability then outstanding from the second party to the first party.

"Thirteenth. First party shall have the right to examine the books of the second party at all reasonable times for the purpose of verifying the validity of any assigned accounts, and shall have a lien upon all moneys, property, or collateral of the second party which is now, or may hereafter be, in the company's possession, or under its control, for any and all indebtedness which may accrue under this agreement or otherwise.

"Fourteenth. Second party represents and warrants that it is absolutely solvent, and makes this statement for the purpose of inducing the first party to make the advances herein provided for, knowing that the first party relies upon this representation in so doing.

"Fifteenth. It is agreed between the parties hereto that no waiver by the first party of any of the terms, provisions, or covenants hereof shall be deemed a waiver of such term, provision, or covenant thereafter. The first party shall be entitled thereafter to the strict performance of such term, provision, or covenant; and this covenant shall also apply to any other agreement or instrument between the parties hereto.

"Sixteenth. The second party, as security for the full and faithful performance of each and every of the covenants, terms, and conditions of this agreement, hereby sells, assigns, transfers, sets over, and conveys unto the first party the following described policies of insurance. * * * "

As further security, it was agreed between Levison & Co. and Kahnweiler, president of the bankrupt, that the bankrupt would execute and deliver a chattel mortgage for $8,000 on its machinery, fixtures, etc. Owing to the necessity of obtaining an assignment of an existing mortgage held by one Behrman, or having the Behrman mortgage satisfied and a new mortgage executed, a delay occurred, so that the bankrupt did not execute and deliver the chattel mortgage until February 19, 1916. This mortgage was promptly filed in the New York county register's office. The details of the execution and delivery of the chattel mortgage are fully and correctly dealt with by the referee and need not be here repeated. On April 17, 1916, the bankrupt made a general assignment for the benefit of creditors, which was followed the next day by the filing of a petition in involuntary bankruptcy.

The total amount of advances made by Levison & Co. up to the filing of the petition in bankruptcy, was $8,341.37. Against these advances, Levison & Co. had collected $8,749.45. After deducting interest and other charges, there still remains a small amount in the hands of Levison & Co. over and above their advances, so that they have received full payment, and this small balance is due from them to the trustee, unless the referee was right in holding that they were entitled to $2,500 under paragraph ninth of the agreement, and $250 attorney's fee under the same paragraph.

Benjamin B. Greller, of New York City, for the motion.
S. C. Sugarman, of New York City, opposed.

MAYER, District Judge (after stating the facts as above). Two questions are in controversy: (1) The validity of the chattel mortgage; and (2) the legal effect of paragraph ninth of the contract. I am satisfied that the mortgage was valid. The testimony of Sugarman, the attorney for Levison & Co., is clear and convincing in respect of the history and details of the mortgage transaction, and the report of the referee need not be added to in that regard.

[1] *Paragraph Ninth.* As the bankrupt is a corporation, the trustee, under the New York law, cannot plead usury. The provisions of the ninth paragraph are, however, different from those in such reported cases as have been called to my attention. Levison & Co. were not under any binding obligation to advance a dollar, because under paragraph first of the contract the advances were to be made only if the orders received by the bankrupt were "acceptable to" Levison & Co. "as security." This gave Levison & Co. uncontrolled discretion at any time to refuse to make further advances. Such a provision was, of course, not open to criticism, for, where the lender is financing a business on orders, he may, with propriety and wisdom, insist that he shall be the sole judge of the acceptability or character of the security upon which he is asked to make advances. But because this provision of paragraph first enabled Levison & Co. to decline at any time to make further advances, it was possible under paragraph ninth for Levison & Co. (quite irrespective of bankruptcy), to receive $2,500 and attorney's fees, even though they had advanced far less than the $100,000 contemplated.

I fully recognize that there are many persons in the same kind of business as Levison & Co., and that it is not the function of the courts to make contracts for grown-up persons. Doubtless there is an useful

field for lenders of this character, so long as their contracts are fair and commercially liveable; but, when these contracts are unconscionable on their face, the courts will scrutinize them closely, to determine, inter alia, whether a liability to pay is really in the nature of an agreement for liquidated damages or merely a penalty in an easily penetrated disguise.

The referee was impressed with the argument of counsel for Levison & Co. as to the "unusual character" of the agreement, for in his opinion he stated:

"In explanation of the apparently unconscionable terms of this agreement, by which, according to the trustee's theory, these petitioners took advantage of the bankrupt's necessity, the petitioners urge what they contend is the unusual character of the transaction. They point out that the advancements were made, not upon actual accounts receivable, but upon mere orders which had not been filled."

But a mere reading of the contract will show that the distinction suggested is of the most shadowy kind; that the lenders were fully protected, and the borrower bound hand and foot. In Matthews v. Coe, 49 N. Y. 57, and 70 N. Y. 239, 26 Am. Rep. 583, the action was for conversion, brought by the owner of the property, on the theory that the defendant had no right to hold it by virtue of a contract void for usury.

"The agreement between the parties" said Judge Allen, in 70 N. Y. at page 242 [26 Am. Rep. 583], "was in form the usual commercial contract by which a commission merchant contracts with a dealer in produce or other merchantable commodity for the loan or advance of his money at the legal rate of interest, to enable the dealer to purchase or carry his merchandise, and also for an agreed commission to undertake the care, management, and sale of the commodity. Such contracts, proper and usual in form, may be made covers for usury, and, when this fact is established by competent proof, they are within the condemnation of the laws against usury, and void. The question is upon contracts for the transaction of a commission business in connection with the use of money, whether a fair, reasonable, usual, and customary allowance for the trouble and inconvenience of transacting the business only has been secured, or whether, under the guise of a commission for services, trouble, and expenses, the lender has sought to and has reserved and secured to himself compensation for the use of his money in excess of the rate of interest allowed by law. The contracts are not necessarily usurious, and the onus is upon the party, seeking to impeach them for usury, to prove the guilty intent, and that the contract is a cover for usury, and for the loan of money upon usury."

The contract between the parties (see record on appeal) provided that the lender was to receive interest on his advances and 2½ per cent. on the advances by way of commission. In Spain v. Talcott, 165 App. Div. 815, 152 N. Y. Supp. 611, Talcott (in addition to interest), for his "services as factor, supervisor, and selling agent," was to receive 3½ per cent. commission on the sale of consigned goods up to $200,000 and 3 per cent. upon sales in excess of that amount. While Spain really conducted the business, nevertheless Talcott, if called upon, was obligated to act as factor and selling agent, and in fact collected the bills. See, also, Cockle v. Flack, 93 U. S. 344, 346, 33 L. Ed. 949. In Houghton v. Burden, 228 U. S. 161, 33 Sup. Ct. 491, 57 L. Ed. 780, the circumstances were peculiar, and the contract contemplated the actual services of Burden, a retired merchant and experi-

enced accountant, who wished to secure light employment and was willing to lend money if he could secure such employment. The con tract will be found in the case reported under the title In re Canfield, 193 Fed. 934, 113 C. C. A. 562, and under paragraph VII thereof it was provided that Burden—

"shall be entitled to compensation for the labor and services to be performed, * * * which compensation is to be measured by computing 1 per cent. per month upon whatever part of the advance shall remain uncollected on the said accounts. * * *"

The contract in Re Mesibovsky, 200 Fed. 562, 119 C. C. A. 42, provided that the 2 per cent. commission was to be calculated on the amount due from the customer. In the case of In re Fishel, 198 Fed. 464, 117 C. C. A. 224, the commission was to be figured on "the gross amount of accounts of the customer assigned to the banker."

From the foregoing it will be seen (1) that all these contracts fixed the commissions or compensation upon the theory that such commission or compensation should be paid for services actually rendered by one obligated to render them if called upon, and (2) that the commission or compensation was to be calculated on some definite and reasonable basis. In none of the contracts considered in these cases can be found any provision such as the ninth paragraph, which obligates the borrower to pay a fixed amount, irrespective of services rendered.

It will be noted that the services agreed to be rendered under paragraph fourth are not the services of a factor. Where a factor sets aside a part of his warehouse, hires buyers or salesmen, or otherwise obligates himself to others genuinely (and not as a mere cover) to render real service to the borrower, it may be that the parties can contract that, in the event of a breach, a stated sum shall be the liquidated damage. In the case at bar, however, all that the lenders bound themselves to do was to collect the accounts, to advise as to credit, to keep books of account, and "to perform all such other services (ejusdem generis) usual in the business" of the borrower.

[2, 3] I find no evidence as to what they did in this regard, except that, when insolvency overtook the bankrupt, the lenders had collected more than enough to cover their advances. Undoubtedly, as between private individuals, the provision of the ninth paragraph would be void for usury, because the obligation to pay, irrespective of service rendered, clearly would make the $2,500 a bonus for a loan. As against this bankrupt corporation, the provision is certainly in the nature of a penalty. Two rules are well established: (1) That where the sum agreed upon is so great as to be unconscionable, it will be regarded as a penalty; (2) that where the stipulated amount is disproportionate to presumable and possible damages, or to a readily ascertainable loss, the courts will treat it as a penalty. Cotheal v. Talmage, 9 N. Y. 554, 61 Am. Dec. 716; Ward v. Hudson River Bridge Co., 125 N. Y. 230, 26 N. E. 256 (in which Judge Gray points out the distinction between a "penalty" and "liquidated damages"); Curtis v. Van Bergh, 161 N. Y. 47, 52, 55 N. E. 398 (an interesting review by Judge Vann); Cæsar v. Rubinson, 174 N. Y. 492, 67 N. E. 58; Hicks v. Monarch Cycle Mfg. Co., 176 N.

Y. 111, 68 N. E. 127 (opinion by Judge Werner analogously in point here); Dunn v. Morgenthau, 73 App. Div. 147, 76 N. Y. Supp. 827, affirmed 175 N. Y. 518, 67 N. E. 1081; Perley v. Shubert, 121 App. Div. 786, 106 N. Y. Supp. 593. See, also, Poppenberg v. R. M. Owen & Co., 84 Misc. Rep. 126, 146 N. Y. Supp. at page 486.

In the case at bar there should be no difficulty in ascertaining the value of the services (such as they were) actually rendered, and I cannot imagine any damages for the breach. The lenders have practically made their own rule of damages, for, in the event that the acceptable assigned orders or accounts reached over $100,000, Levison & Co. were to receive 2½ per cent. on the gross amount thus assigned. To save the expense of sending the matter back to the referee, I think on the evidence in this record that it can be found that Levison & Co. are entitled to 2½ per cent. on $9,475.58, the gross amount of the assigned accounts—a reasonable compensation for the service they bound themselves to render. If, however, Levison & Co. desire to offer proof of damages in excess of this amount, the claim will be remitted to the referee for that purpose only.

[4] I am of opinion that Levison & Co. are entitled to recover a reasonable attorney's fee, because they were compelled to defend the validity of the mortgage. While the services rendered to Levison & Co. in this connection by their attorney are not set forth in detail, the referee was undoubtedly sufficiently familiar with them to be able to fix the fee intelligently, and the sum of $250 seems to me to be reasonable.

[5] As neither litigant has been wholly successful, the disbursements will be taxed equally against the trustee and Levison & Co.

Submit order in accordance herewith on two days' notice.