MEDICAL ARTS BLDG. CO. v. SOUTHERN FINANCE & DEVELOPMENT CO. et al.

Circuit Court of Appeals, Fifth Circuit. January 7, 1929.

No. 5454.

W. J. Rogers and R. F. Spencer, both of San Antonio, Tex. (R. F. Spencer, W. J. Rogers, and Spencer, Rogers & Lewis, all of San Antonio, Tex., on the brief), for appellant.

Sylvan Lang, Claude V. Birkhead, W. B. Teagarden, W. B. Jack Ball, and Robert J. McMillan, all of San Antonio, Tex. (W. B. Teagarden, Bruce W. Teagarden, Birkhead, Lang & Beckmann, Dick O. Terrell, Robt. J. McMillan, Terrell, Davis, Huff & McMillan, and W. B. Jack Ball, all of San Antonio, Tex., on the briefs), for appellees.

Before WALKER and FOSTER, Circuit Judges, and BORAH, District Judge.

BORAH, District Judge. Appellant, the Medical Arts Building Company (hereinafter called the Building Company), was chartered and created under the laws of the state of Texas in June, 1923, for the purpose of erecting and maintaining an office building in San Antonio, Tex. To provide funds with which to erect and construct this building, it caused to be made, executed, and delivered to Melvin L. Straus, trustee, a deed of trust or mortgage securing $950,000 of 6 per cent. first mortgage gold bonds. The mortgage and the bonds were issued November 15, 1924, and were sold and delivered to S. W. Straus & Co. of Chicago, Ill., at a discount of 11 per cent., and the net proceeds of said bonds were used in the construction of said Medical Building. As so often happens, it was later found that the project was underfinanced, and before the building was completed and ready for occupancy the Building Company found itself without funds, and in consequence further construction was suspended. During this period of time interest was running and accumulating on the first mortgage bonds and taxes were accruing with no revenues from the building.

While in this state of financial embarrassment, an effort was made by the officers of said Building Company to float a second mortgage bond issue on the property in the sum of $150,000, but without success. Later, and on January 25, 1926, the Building Company, joined in said contract by Clifton George, its president and principal stockholder, and Ralph H. Cameron, likewise an officer and the architect in charge of the building, the latter two acting individually, contracted with P. J. Dee of Chicago, Ill., as its agent to sell for the account of their principal, the Building Company, a second bond issue of the par value of $150,000. The agreement goes into detail as to date, amount, and maturity of said bonds, as well as the condition of the deed of trust by which said bonds are to be secured; and recites that the bonds are to be second and inferior to the first mortgage of $950,000 in favor of Melvin L. Straus, trustee. It is provided in the agreement that "the agent agrees to sell for the borrower and the borrower agrees to sell and deliver through the agent to its purchaser, said bond issue payable as directed by the agent for a sum equal to seventy-five (75%) per centum of the par value thereof, to be delivered by the agent to S. W. Straus & Company a co-partnership of Chicago, Illinois, and/or Melvin L. Straus (or his successor in trust) towards the completion of the Clifton Building now being erected by said Medical Arts Building Company." It is recognized in the contract "that the agent will not be able to sell the bonds at par and he shall, and is hereby authorized to sell said bonds for such price as he may desire to do but guarantees to get the borrower for said bonds seventy-five (75%) per centum of the par thereof."

The bonds were later issued in accordance with the agreement, were delivered to Claude V. Birkhead, trustee, in the deed of trust securing said bonds, and were by P. J. Dee sold to the Alamo Amusement Company for $117,250; $112,500 of the sale price was paid to the Building Company by check through Melvin L. Straus, trustee; $3,500 was paid to Dee's attorney; and Dee received as his commission $1,250 and $11,000 in par value of preferred stock.

The Southern Finance & Development Company (hereinafter called the Development Company) was later organized and purchased the second mortgage bond issue from the Alamo Amusement Company.

The Building Company subsequently defaulted in the payment of its bonds, and as a result foreclosure proceedings were instituted by the then owner of said bonds, the Development Company. In its bill of complaint it charged that the Building Company had defaulted in the payment of the principal

of four second mortgage bonds of $2,800 each, and that under the terms of the deed of trust securing same the entire issue had been, upon proper notice given, brought to maturity. It charged that a receiver was necessary to take charge of the building, collect the rents, and otherwise manage and conduct the affairs of the debtor company; and that the Building Company in the deed of trust had specifically consented, under the conditions complained of, to the appointment of a receiver. It prayed for judgment for the full amount of the outstanding bonds of the second bond issue in principal and interest, attorney's fees, and costs; that a receiver be appointed; and finally that the property be sold by or through the receiver so appointed but subject to the first mortgage in favor of Melvin L. Straus, trustee. The bill impleads as defendants, in addition to the Building Company, Clifton George, Ralph H. Cameron, A. Y. Baker, the City National Bank of San Antonio, Tex., and J. C. Hall, trustee, as the holders of the six notes of the Building Company of $10,000 each, secured by a deed of trust as a third mortgage or lien upon the property.

The Medical Arts Building Company, in its answer, admits the execution and delivery of the second mortgage bonds in the sum of $150,000 to Claude V. Birkhead, trustee, but by way of cross-complaint charges that the difference between $112,500, which it acknowledges having received, and the $150,000, the principal amount of said issue, or $37,500, was usury; that complainant should be compelled to return or give it credit for double the amount of the usurious charges which, it said, aggregates $95,000. In the alternative, if the charge of usury be overruled, that $37,500, representing bonds given as a bonus or commission, are null under the Constitution of the state of Texas.

This statement of facts embodies the only issues joined in the separable controversy between the Development Company and the Building Company. There being no issue concerning the breach of the conditions of the provisions of the terms of the mortgage or deed of trust concerning the payment of the bonds sued on, there remains only for determination the defense of usury and whether or not certain bonds represent a fictitious indebtedness and were void in the hands of complainant, the Development Company.

"Usury" may be defined as interest in excess of the legal rate charged to a borrower for the use of money. One of the essentials to the definition of usury is that the compensation of the broker in effecting the transaction must come wholly from the borrower and not from the lender. Best v. British & American Mortgage Co. (C. C.) 79 F. 402.

It is generally agreed as a matter of principle that to constitute usury there must exist an intent to exact more than the legal maximum for use of money. Bank of United States v. Waggener, 9 Pet. 399, 9 L. Ed. 163; Wood v. Babbitt (C. C.) 149 F. 822. The plea of usury in this case is predicated upon the premise that an unfair and unreasonable exaction is effected by the contract under which the bonds were issued and sold to the Alamo Amusement Company. This is the special defense of the Building Company, and the burden is cast upon it to prove its plea of usury; complainant having made out its prima facie case by the introduction of the bonds of the original mortgage which were issued under the authority of the directors and officers of the Building Company. Lowenstein & Son v. British American Mfg. Co. (C. C. A.) 7 F.(2d) 54. It is also incumbent upon the Building Company to establish the facts necessary to constitute usury by a preponderance of the evidence. The evidence must be strong, clear, and convincing and of such a character as to satisfy the judgment of the court. Wood v. Babbitt (C. C.) 149 F. 822; Houghton v. Burden, 228 U. S. 161, 33 S. Ct. 491, 57 L. Ed. 780.

Usury is not established by merely showing that the borrowing company realized less than par for its bonds. It was conceded by the Building Company in contracting with Dee for the sale of its bonds that they would have to be sold at a discount. That fact alone did not mean that the discount was considered or thought to be usurious. It is a matter of daily occurrence that bonds are sold at a discount. The Louisiana Supreme Court in People's Bank & Trust Co. v. Fenwick Sanitarium, Ltd., et al., 130 La. 723, 58 So. 523, 43 L. R. A. (N. S.) 211, Ann. Cas. 1913C, 1322, refused to hold a transaction usurious where the facts were in many respects similar to those in the case under consideration. In that case the sanitarium found it necessary to raise cash to meet its overdue obligations. It found it difficult to raise the required amount by mortgaging its property, but finally the People's Bank & Trust Company agreed that if the sanitarium would issue a series of notes aggregating $66,000, it would buy the notes for $57,500. This arrangement the court says was "a few days prior to the date of the confection of the mortgage." The transaction went through,

the sanitarium defaulted, and when foreclosure proceedings were instituted by the bank it was met by an injunction and a charge that the difference between the $57,500 and the $66,000 was usurious interest; also, that 8 per cent. per annum from date of notes was usurious. The court rejected the contention and in its syllabus said: "Negotiable instruments may be sold for whatever the seller and the buyer may agree on, and where the evidence shows the notes sued on were bought by the holder and were not given merely as the evidence of a loan, the maker will not be heard to say that the difference between the price of the notes and their face value is usurious interest, and that therefore the holder should not be allowed to recover this sum."

The statutory laws of Louisiana on the question of usury are largely similar to those of Texas, and the Constitution of Louisiana prohibits the issuance of stocks or bonds by a corporation except for cash, labor or property received.

█ It is said in appellant's supplemental brief that the fact that the representative of the Alamo Amusement Company discussed the terms of the proposed loan before the bonds were printed, and the further fact that its representatives dictated the terms of the bonds as to maturity, etc., is convincing that the transaction was intended as a loan and not as a sale of bonds. This argument is not persuasive. Dee, as the agent of the Building Company, had guaranteed to sell the bonds for his principal. There is no reason why Dee should not discuss the proposed bond issue with any prospective buyer for the very purpose of knowing that the terms were satisfactory to the buyer before putting the issuing company to the expense of printing same. It is the rule generally, as we understand it, for the borrower to submit a draft of the proposed bonds and mortgage to the bonding house to or through whom the bonds are to be sold, for the purpose of ascertaining whether or not the terms and conditions are satisfactory before incurring the expense of issuing same. These circumstances do not seem to throw any suspicion on the transaction or to militate against the terms of the written contract whereby the Building Company authorized, not a loan, but a sale of the bonds provided the sale be at not less than 75 per centum of the par value. If it was a sale of chattels, it was not a loan at usurious interest.

The trial court, after carefully reviewing the evidence, came to the conclusion that in the preparation of the written contract under which the bonds were sold there was not in the minds of the parties the intention to evade the usury laws by carrying out the transaction in the manner outlined. In this we concur. We also concur with the trial judge "that the bond issue to the extent of $37,500.00 was not a fictitious issue within the constitutional inhibition."

This brings us now to a consideration of the case of the defendant, Medical Arts Building Company, against its codefendants, Ralph Cameron, A. Y. Baker, and the City National Bank.

The controversy between the Building Company and Ralph H. Cameron, A. Y. Baker, and the City National Bank has no connection with the controversy between Building Company and the Finance Company. While the Finance Company made Cameron et al. codefendants with the Building Company, it was because his third mortgage of $50,000, bore upon the property foreclosed upon. Cameron in his cross-bill for affirmative relief concedes the validity of the first and second mortgage bonds and the priority of the rights and liens of the holders thereof over the mortgage securing his six notes of $10,000 each. The Building Company, answering Cameron's cross-bill or suit for judgment against it on the six notes of $10,000 each, admits the execution of the notes and the deed of trust securing same, but contends that same are void because five of said notes were given in exchange for $50,000 par value of the capital stock of the Building Company and because the sixth note given to Cameron in consideration of the payment of the Martin Wright indebtedness was usurious. Cameron had a contract with the Building Company by which he was to receive $50,000 in par value of its capital stock for preparing plans and supervising the erection of a 13-story office building to cost approximately $1,000,000. Under this contract Cameron was to receive as compensation $50,000 par value of the stock of the Building Company, but was given the privilege, if exercised within one year from the completion and acceptance of the building, to return any or all of the stock and receive in exchange therefor five notes, each for one-fifth of the stock returned.

█ In accordance with the contract, Cameron surrendered his $50,000 of stock, and received in exchange therefor five notes of the Building Company each for the principal sum of $10,000; at the same time receiving a sixth note of like amount to reimburse him for having discharged the Wright claim. These notes were secured by a deed of trust

third in rank on the property of the Building Company. It is the validity of these notes and the right of Cameron to recover thereon that is questioned by the maker, the Building Company. That the contract under which Cameron received the stock, and as architect undertook to draw plans and supervise the construction of the building in question, authorized the issuance of the notes in exchange for the stock, cannot be questioned. And as between the Building Company and Cameron the former should not be heard to complain. Courts, we believe, should, however, be slow to approve a transaction which gives to one, who has received pay for his services in stock, the right later, if he finds the stock has little or no value, to change his position from that of a stockholder to that of a mortgage creditor to the prejudice of ordinary creditors and other stockholders. It is said the Building Company was solvent and a going concern when the six mortgage notes were given. Some circumstances would lead to a different conclusion. Before the notes were given, Cameron was appealed to by the president of the Building Company to pay the Wright claim as the company could not do so; that if the claim was not paid Wright would file a mechanic's lien on the property, which would be a default under the Straus' mortgage and might cause serious trouble. These facts, taken in connection with the facts surrounding the sale of the second mortgage bonds, would indicate the Building Company was not solvent, and the issuance of the notes and mortgage securing same was necessarily prejudicial to other unsecured creditors. It is said also, on behalf of Cameron, that there is no creditor now who was a creditor when the contract was made. It is questionable whether or not that is the test, but rather the test should be that it should be without prejudice to the rights of creditors existing at the time the exchange was made. We do not question the right of a corporation under proper conditions to purchase its own stock so long as same is placed in the treasury where it can be reissued and sold. Such transactions, however, should be free from fraud, actual or constructive, and the rights of its creditors should in no way be affected thereby. 7 Ruling Case Law, pages 547–548, Porter v. Plymouth Gold Mining Co., 29 Mont. 347, 74 P. 938, 101 Am. St. Rep. 569, and authorities there cited. In such transactions as this, each case must be determined by its own peculiar facts. In the instant case, as we understand the facts, no creditor or stockholder is complaining, although a general order was made permitting any creditor or stockholder to intervene. Not only is no one complaining, but the First National Corporation, who, we understand, is the only ordinary creditor, has intervened as such and also as the holder of the majority of the preferred stock of the Building Company and has approved the claim of Cameron, or at least does not question it.

Upon these facts we do not feel justified in disturbing the decree of the trial court on this branch of the case; accordingly, the decree is in all things affirmed.