### SCHIEBER v. HAMRE.

(Circuit Court of Appeals. Eighth Circuit. January 4, 1926.)

No. 7006.

1. Bankruptcy ⬤413(½)—Attorney, to vote on question of authorizing trustee to oppose discharge, need not produce power of attorney from clients.

Under Bankruptcy Act, § 14b, as amended by Act June 25, 1910, § 6 (Comp. St. § 9598), attorney authorized to practice in federal courts, assuming to represent clients, creditors of bankrupt, need not, in absence of challenge to his authority, produce a power of attorney from his clients to empower him to vote on question of authorizing trustee to oppose discharge; and trustee's opposition to discharge was not unauthorized, because directed only by vote of attorney.

2. Bankruptcy ⬤467, 468—Trial is de novo on appeal in bankruptcy proceedings; case will be disposed of on appeal.

On appeal in bankruptcy proceedings, as in equity, trial is de novo, and, if record is sufficiently full, case will be disposed of in appellate court, except in cases involving peculiar facts.

3. Bankruptcy ⬤409(1)—Failure to keep account books and intent to conceal financial condition must concur, to warrant denial of discharge on that ground.

Before a bankrupt can be denied discharge, under Bankruptcy Act, § 14b (2), as amended by Act June 25, 1910, § 6 (Comp. St. § 9598), for failure to keep books of account, there must appear, not only such failure, but an intent on part of bankrupt to conceal his true financial condition, which intent, however, may be presumed from facts and circumstances.

4. Bankruptcy ⬤414(3)—Evidence held to warrant denial of discharge for failure to keep account books.

Evidence held to warrant denial of discharge, under Bankruptcy Act, § 14b (2), as amended by Act June 25, 1910, § 6 (Comp. St. § 9598), for failure to keep books of account or records, except as to creditors who were estopped to oppose discharge.

5. Bankruptcy ⬤405—Creditors held estopped to oppose discharge.

Creditors, who, after managing debtor's business for several months through a credit association, procured execution by debtor of a deed of trust of all his property, less exemptions, to manager of the association, for the benefit of creditors, in which they agreed to release him from all claims to same extent as he would be released by proceedings in bankruptcy, and who thereafter violated covenants of the deed, and threw debtor into bankruptcy, held estopped to oppose a discharge.

6. Bankruptcy ⬤405—Creditors authorizing execution of deed of trust in their names held bound thereby.

As respects estoppel to oppose discharge, creditors, who by power of attorney authorized manager of credit association in their names to join in execution of deed of trust by debtor for benefit of creditors, held bound by the terms of the deed, though their names were not in fact signed.

Appeal from the District Court of the United States for the District of North Dakota; Andrew Miller, Judge.

In the matter of the bankruptcy of P. C. Hamre. From a decree granting bankrupt's petition for discharge, O. A. Schieber, trustee, appeals. Proceeding remanded, with instructions to modify decree.

G. W. Twiford, of Minot, N. D., for appellant.

Halvor L. Halvorson, of Minot, N. D., for appellee.

Before KENYON and BOOTH, Circuit Judges, and AMIDON, District Judge.

BOOTH, Circuit Judge. On September 29, 1923, P. C. Hamre, on the petition of three of his creditors, was adjudicated a bankrupt. In due course he applied for a discharge. The trustee appeared in opposi-

tion. The matter was referred to a special master, who reported, recommending that a discharge be denied. The court below disregarded the recommendation of the special master, and ordered that a discharge be granted. An appeal by the trustee has brought the matter here.

One of the main questions involved is whether the trustee was duly authorized to oppose the discharge, as required by section 14b of the Bankruptcy Act, as amended by Act June 25, 1910, § 6 (36 Stat. 838 [Comp. St. § 9598]). The record discloses that a meeting of creditors was duly called by the referee for the purpose of passing on the question whether the trustee should be so authorized. At this meeting appeared one Twiford, an attorney at law duly authorized to practice in the federal courts. He had theretofore represented various creditors in the bankruptcy proceeding, and he now voted, as representing these creditors, in favor of authorizing the trustee to oppose the discharge. No other votes were cast. Twiford had no power of attorney from any of the creditors whom he assumed to represent, save one, Marshall Field & Co., and the sufficiency even of this power of attorney is challenged.

Upon this state of facts the court below held that Twiford had no authority to vote in behalf of the creditors on the question of authorizing the trustee to oppose the discharge of the bankrupt, and therefore that the trustee had no authority to make such opposition. In these conclusions we think the court erred, and we do not find it necessary to pass upon the sufficiency of the Marshall Field & Co. power of attorney.

The authorities are not in accord upon the question whether an attorney at law, who is duly authorized to practice in the federal courts, and who assumes to represent his clients, creditors in a bankruptcy proceeding, must, in the absence of a direct challenge to his authority, produce a power of attorney from his clients to empower him to vote on the question of authorizing the trustee to oppose the discharge of the bankrupt, or on the kindred question of electing a trustee. That such a power of attorney is necessary is held directly or impliedly by the following authorities: Remington on Bankruptcy (3d Ed.) § 707; In re Blankfein (D. C.) 97 F. 191; In re Sugenheimer (D. C.) 91 F. 744; In re Eagles & Crisp (D. C.) 99 F. 695; In re Richards (D. C.) 103 F. 849; In re Scully (D. C.) 108 F. 372; In re Henschel (D. C.) 109 F. 861; Id., 113 F. 443, 51 C. C. A. 277; In re Lazoris (D. C.) 120 F. 716; In re Capitol Trading Co. (D. C.) 229 F. 806;

In re Ruhlman (C. C. A.) 279 F. 250; Creditors v. Williams, Fed Cas. No. 3,379; In re Knoepfel, Fed. Cas. No. 7,891; In re Palmer, Fed. Cas. No. 10,682; In re Purvis, Fed. Cas. No. 11,476. That such power of attorney is not necessary is held either directly or impliedly by the following authorities: In re Gasser (C. C. A. 8) 104 F. 537, 44 C. C. A. 20; In re Peck (D. C.) 120 F. 972; In re Crooker Co., 27 Am. Bankr. Rep. 241.

[1] We do not think the language of the Bankruptcy Act, when properly construed, requires such power of attorney, nor do we think the conditions of practice in this circuit to be such as to compel us to adopt such a rule. In the case of In re Gasser, supra, this court, speaking by Judge Sanborn, said:

"Proceedings in bankruptcy are proceedings in court. An attorney at law, admitted to practice in a court, is presumed to have authority to appear and act for any party whom he seeks to represent in that court. The Bankruptcy Law of 1898 provides that a creditor may file objections to and oppose the discharge of a bankrupt, and that the term 'creditor' shall include the duly authorized agent, attorney, or proxy of a creditor. An attorney at law, admitted to practice in the court, who enters his appearance for a creditor in opposition to the discharge of a bankrupt, is presumed, under the general law, to be his duly authorized attorney, and is therefore included under the term 'creditor,' and is authorized to appear and to oppose the discharge of the bankrupt."

The views thus expressed, with which we are in hearty accord, are, we think, decisive of the question under consideration in the case at bar. Our conclusion is that failure by Twiford to produce powers of attorney from the creditors whom he represented did not invalidate the vote authorizing the trustee to oppose the discharge of the bankrupt.

It is contended by the appellant that this question as to the authority of the trustee was the only question passed upon by the court below, and that therefore this court cannot consider other questions in the record. We cannot agree with this contention, even conceding, though not deciding, that the court below considered and passed upon only the single question mentioned.

[2] Upon an appeal in equity, and also upon an appeal in bankruptcy proceedings, trial is had de novo, and the case will be disposed of in the appellate court, if the record is sufficiently full, except in cases involving peculiar facts. Elliott v. Toeppner, 187 U. S. 327, 23 S. Ct. 133, 47 L. Ed. 200; Houghton v. Burden, 228 U. S. 161, 33 S. Ct. 491,

57 L. Ed. 780; Courier-Journal Co. v. Schaefer-Meyer Co., 101 F. 699, 41 C. C. A. 614; Dodge v. Norlin (C. C. A. 8) 133 F. 363, 66 C. C. A. 425; Harrison v. Clarke (C. C. A. 8) 182 F. 765, 105 C. C. A. 197; In re B. & R. Glove Corp. (C. C. A.) 279 F. 372; Unkle v. Wills (C. C. A. 8) 281 F. 29; Wood County Grocer Co. v. Frazer (C. C. A. 8) 284 F. 691; Stalcup v. Jepson (C. C. A. 8) 289 F. 479; Daniels & Fisher Stores Co. v. Gregg (opinion this court Nov. 2, 1925) 9 F.(2d) 43. In Stalcup v. Jepson, supra, a case somewhat similar to the one at bar, this court said:

"The order denying discharge is general, but the record contains a brief opinion of the District Judge, in which he found that discharge should be denied on the second ground stated. He expressed no opinion as to whether either of the other grounds of objection was sustained by the evidence. It is argued here (a) that the facts do not support the conclusion stated by the District Judge; and (b) that this court has no right to review and weigh the evidence for the purpose of deciding whether either of the other objections was established; that we are restricted to an inquiry as to whether the reason given by the District Judge is sustained by the proof, and, if not, there must be reversal. We must reject both contentions. As to the first, we have no doubt that the facts fully support the conclusion of the court on which the order was entered, and, as to the second, the appeal of the bankrupt comes here under section 25a (Comp. St. § 9609), as in equity cases, and the facts and law are both submitted to us for review and decision."

To the same effect, see Daniels & Fisher Stores Co. v. Gregg, supra.

Passing to a consideration of the merits, the record discloses the following ground for opposing the discharge:

"First Specification.—Said bankrupt has, with intent to conceal his financial condition, failed to keep books of account or records, from which such condition might be ascertained, in that during the year 1922 said bankrupt did sell large amounts of merchandise to divers persons and not enter the sales or receipts from said sales on his books or records and did not enter on his books and records funerals which he directed and the fees he received from same and did not enter on his books or records the caskets he sold in the course of business and the money he received for same."

This specification is based upon section 14b (2) of the Bankruptcy Act, as amended, which provides for a discharge of the bankrupt "unless he has * * * with intent to conceal his financial condition, destroyed, concealed, or failed to keep books of account or records from which such condition might be ascertained."

The record discloses the following facts tending to support the specification: That during the first half of the year 1922 the bankrupt paid to his wife approximately $2,300 on account of debts owed by him to her, and that such payments were made out of the proceeds of the business of the bankrupt, but were not entered upon the books. These payments were made partly from sales of furniture, partly from sales of caskets, partly from moneys received by the bankrupt for acting as director at funerals. The record further discloses that the bankrupt kept no accurate account of his expenses and that the same were not entered upon the books; and the record further discloses that certain household furniture was taken from the stock of the bankrupt and turned over to his wife and that no record was kept upon the books of such transaction.

[3] Before a bankrupt may be denied a discharge for failure to keep books of account under the clause of the statute above quoted, two things must concur: First, there must be a failure to keep proper and accurate books of account; second, there must be an intent on the part of the bankrupt to conceal his true financial condition from his creditors. This intent, however, may be presumed from facts and circumstances. No satisfactory explanation was given by the bankrupt relative to his failure to keep accurate books of account, so far as they related to the items above mentioned, and under these circumstances we think that the rule announced by this court in McKibbon v. Haskell, 198 F. 639, 642, 117 C. C. A. 343, 346, should apply. In that case the court in its opinion said:

"The act of Congress proclaims the presumption and expectation of the law that honest merchants will keep account books which will disclose their true financial condition. In the absence of prevailing evidence to the contrary, every man is presumed to intend the natural and inevitable consequence of his acts."

[4] Considering the facts in the light of the rule quoted, we are led to the conclusion that the evidence sustains the specification of objection to a discharge, and that, in the absence of countervailing considerations, a discharge should be refused.

It is contended, however, that the credi-

tors are estopped to oppose the discharge of the bankrupt. The basis of the alleged estoppel is found in certain transactions prior to the bankruptcy proceedings. It appears from the record that in May, 1922, an extension agreement was entered into between Hamre and a number of his creditors, through the agency of the Northwestern Jobbers' Credit Bureau, having as its manager one Marin. The business of Hamre was thereafter run under the supervision, more or less direct, of the Bureau, from May to August, 1922, at a cost to the estate of approximately $2,500. At the close of this period a statement made by the manager of the Bureau showed that the assets were $54,542.88; the liabilities, $43,900. The liability figures included the $2,500 cost of running the business by the Bureau during the period mentioned.

The Bureau, finding that the handling of the business under the extension agreement was unsatisfactory, persuaded Hamre to execute a deed of trust, conveying all his property, less exemptions, to Marin, as manager of the Northwestern Jobbers' Credit Bureau, for the benefit of creditors. The deed bore date August 25, 1922, and was executed by Hamre and Marin. It contemplated execution also by the various creditors, and Marin took powers of attorney from almost all of the creditors, wherein they consented to the trust deed, and authorized Marin to execute the same for them, and agreed to be bound by the conditions thereof. They also filed their claims with Marin.

Though having these powers of attorney from the creditors, Marin did not in fact execute the trust agreement in their names, naively explaining to the creditors (but not to Hamre) that "your name will not be attached to the trust agreement, or your consent made binding, until we feel your interests are not prejudiced thereby." Meanwhile the business of Hamre was taken control of by Marin, and retained until after September, 1923. The assets were largely sold. Disbursements were made for taxes and expenses, amounting to more than $7,000. Eventually about $6,300 in cash and $9,900 in uncollected accounts were turned over by Marin to the trustee in bankruptcy.

In April, 1923, an action was begun by the Minneapolis Bedding Company against Hamre in the state district court of Ramsey county, Minn. The Bedding Company was one of the creditors of Hamre, who had consented to the trust deed and had given Marin power of attorney to execute the same on its behalf. Marin was garnisheed, and disclosed that he had in his possession moneys belonging to Hamre, which were held under a common-law assignment for the benefit of Hamre's creditors. Judgment was obtained in the main suit against Hamre by default, and thereafter on August 6, 1923, judgment was entered against Marin in the garnishment suit upon his disclosure. Execution issued, and money sufficient in amount to satisfy the judgment was paid by Marin to the judgment creditor. Thereupon three other creditors of Hamre, all of whom had consented to the trust deed of August 25, 1922, and had given Marin power of attorney to execute the same in their names, filed a petition in bankruptcy against him, alleging as the act of bankruptcy that he had, while insolvent, permitted the Bedding Company to obtain a preference through legal proceedings by suffering a judgment to be entered in the suit above mentioned and had taken no steps to vacate or discharge such preference.

This suit by the Bedding Company, in which Marin was garnisheed, has numerous earmarks of collusion between those two parties. The payment of the garnishee fees was waived by Marin. No attempt to defeat the garnishment, upon which the jurisdiction of the court depended, was made by Marin. He was still trustee under the trust deed of August 25, 1922, and still held the assets of Hamre under that deed, which had not been canceled or abandoned. Whether under such circumstances the assets in the hands of Marin were subject to garnishment may well be doubted. After the judgment against Hamre had been satisfied by the payment by Marin to the Bedding Company, the money was turned back by the Bedding Company to Marin, and he continued to hold it until it was turned over by him to the trustee in bankruptcy, and from the account rendered by Marin, trustee, to the bankruptcy court, it appears quite probable that the attorneys who brought the suit for the Bedding Company were paid by Marin out of the funds held in his hands as trustee under the deed of trust. The end apparently sought to be accomplished by Marin for the creditors had thus been reached. The estate had been so administered that it was now unquestionably insolvent. Hamre was adjudicated a bankrupt, and the creditors were now in a position to demand that his discharge be denied. This demand they attempted to have made by the trustee in bankruptcy, as above set forth.

The trust deed of August 25, 1922, contained the following:

"The parties of the third part [the cred-

itors] are willing to give and do hereby give the party of the first part an extension of time for the payment of the respective amounts due said third parties for a period of twelve months from the date hereof on the terms and conditions hereinafter set forth. ❋ ❋ ❋

"That the parties of the third part, in consideration of the premises, hereby mutually and severally agree with each other and with the parties of the first part and second part severally, that the parties of the third part will not or either attempt to enforce or obtain, payment of their several respective amounts and demands by legal proceedings or otherwise during the continuance of this trust. ❋ ❋ ❋

"In consideration of the foregoing covenants the parties of the third part hereby agree to release said party of the first part from all liability on the amounts due them the same as said first party would be released by proceedings in bankruptcy."

[5] In view of the foregoing facts disclosed by the record, we think the creditors of Hamre who acted through the Northwestern Jobbers' Credit Bureau, and Marin as manager, were estopped to object to the discharge of Hamre. The bringing of the suit by the Bedding Company was a plain violation of the covenants of the deed of trust. The collusive action of Marin was a plain violation of his duties as trustee under said deed.

[6] It may be said that the creditors were not parties to the deed of trust, because they had not executed the same. But they had assented to said deed, and had authorized Marin to execute the same in their names. For nearly a year Marin administered the estate in their behalf. Under such circumstances, equity will consider that as done which ought to have been done. The creditors who gave their powers of attorney to Marin must stand as though they had in fact executed the deed of trust.

It may be said that they received no dividend, no benefit from the deed of trust, and therefore were not bound by its terms. Whether they received a dividend is of little consequence. The estate was administered by their agent, Marin, for nearly a year, and he had assets in his hands from which a dividend could have been paid, if he had so wished. He charged and received compensation from the estate for administering it on behalf on the creditors. Hamre during this time was bereft of the control of his own property.

It may be further claimed that the creditors did not find out that Hamre had failed to keep proper books of account until shortly prior to the bankruptcy proceedings. The answer is that the creditors had partial control of the business under the extension agreement of May, 1922, and complete control under the trust deed of August 25, 1922, and that Marin made a personal investigation into the methods of the business in the early fall of 1922; so that the loose method of bookkeeping was either known or could have been known in the summer or early fall of 1922.

No action was taken by Marin or the creditors to cancel or repudiate the deed of trust. They recognized the deed of trust so long as it served their purpose; but when it was no longer useful they calmly disregarded it, and proceeded to throw Hamre into bankruptcy. Since they could not have participated in the assets of their debtor under the deed of trust without granting him a discharge, equity will hold that they are estopped to demand any greater advantage in the bankruptcy court.

It does not appear clearly from the record what other creditors, if any, of the bankrupt there are, besides those who acted through the Bureau, its agents, and attorneys. For this reason the proceeding will be remanded to the court below, with instructions to modify its decree, so that the bankrupt shall be discharged of the debts of all creditors who appeared in the proceedings, directly or indirectly, through the Northwestern Jobbers' Credit Bureau, its agents, or attorneys; as to the debts of other creditors, if any, the discharge not to be operative.