[Civ. No. 4225.   Third Appellate District.—February 3, 1931.]

## O. A. GRAYBEAL COMPANY (a Corporation), Appellant, v. WM. M. COOK et al., Respondents.

Davis & Thorne, Keeler, Fickert & French and W. A. Alderson for Appellant.

Clock, McWhinnet & Clock, Denio, Hart, Taubman & Simpson, O'Melveny, Tuller & Myers and Swaffield & Swaffield for Respondents.

THE COURT.—This cause is before us on appeal from a judgment entered in favor of the defendants in an action where the plaintiff sought to recover a penalty, as provided by the second subdivision of section 3 of the Initiative Act, adopted at the general election, held on November 5, 1918, covering the subject of usury. (Deering's Gen. Laws 1923, part 1, p. 1384, Act No. 3757.)

By reason of the fact that the findings of the trial court simply negative the allegations of plaintiff's amended complaint, it is necessary to summarize the different paragraphs set forth in said complaint.

The first and second paragraphs of the complaint are undenied and uncontroverted. The second paragraph of the complaint sets forth that certain premises owned by

the plaintiff were encumbered by notes and mortgage in the aggregate sum of $267,380; that the notes and mortgage to secure the same were held and owned by the Associated Oil Company. The third paragraph alleges that the plaintiff desired to borrow the sum of $250,000 for the purpose of paying off and having said notes and mortgage satisfied, that the plaintiff was able to pay the sum of $20,000, or thereabouts, on said notes, leaving the sum of $250,000 to be raised by the loan. The fourth paragraph sets forth that on or about the month of June, 1924, the defendants promised and agreed to loan to the plaintiff the sum of $250,000 and to accept as security therefor a mortgage on said tract of land, the mortgage on said land to be paid off and satisfied; that the plaintiff was to pay the defendants' interest on said sum of $250,000 at the rate of seven per cent per annum; that the plaintiff accepted all of the terms and conditions of said promise and agreement on the part of the defendants, and to furnish the difference between the $250,000 and the amount necessary to pay the sum of $267,380 due to the Associated Oil Company.

The fifth paragraph sets forth that after said promise and agreement on the part of the plaintiff and the defendants, and while proceeding to consummate the deal, the defendants informed the plaintiff that because of contracts for the sale of portions of said land, having been executed by the plaintiff and which were then in force, said contracts should become a first lien on said tract of land, or portions thereof, with priority over the new mortgage to be given by the plaintiff to the defendants; that it was then agreed between the defendants and the plaintiff that, instead of the plaintiff executing a new mortgage on said tract of land to secure said sum of $250,000, the plaintiff should have assigned to the defendants, as security for said loan of $250,000, said notes and mortgage then on said tract of land. The sixth paragraph sets forth that in pursuance of said agreement the plaintiff proceeded to negotiate with and to secure from Associated Oil Company an assignment of said mortgage and notes to the defendants; said Associated Oil Company to be paid in full the entire amount then due on said notes and mortgage; that in addition to the sum of $250,000 then due on said mortgage, there was due a further sum of $22,593.79; that at the re-

quest of the defendants, the transaction between the plaintiff and the defendants was placed with and entrusted to the Marine Trust & Savings Bank of Long Beach in escrow; said Marine Trust & Savings Bank of Long Beach being named and selected by the defendants as their trustee and agent and authorized and instructed to receive and accept said matter in escrow and to act therein as agent and trustee of the defendants.

The seventh paragraph of the complaint sets forth that pursuant to said promise and agreement, the defendants deposited and placed in escrow with said Marine Trust & Savings Bank of Long Beach the sum of $250,000, and the plaintiff deposited with said Marine Trust & Savings Bank of Long Beach the sum of $22,593.79, said bank being instructed to pay the same to the Associated Oil Company for the transfer and assignment of said notes and mortgage; that said notes and mortgage were assigned and transferred to the Marine Trust & Savings Bank of Long Beach. The eighth paragraph of the complaint sets forth that as a condition upon which the defendants would loan to the plaintiff the sum of $250,000, the defendants would require that plaintiff guarantee the payment of said notes and the performance of all the conditions contained in the mortgage.

Paragraph nine of the complaint sets forth that in the instructions executed by the plaintiff and the defendants and given to the Marine Trust & Savings Bank of Long Beach, the defendants authorized and directed said Marine Trust & Savings Bank to act for them as their agent and trustee, to receive payment from the plaintiff of said loan of $250,000 and to pay the same to defendants, and likewise authorized and directed said bank to execute a declaration of trust, specifying that it held the title to such notes and mortgage for the benefit of defendants, stating the amount of the beneficial interest therein of each defendant.

The tenth paragraph of the complaint sets forth that during the negotiations for said loan, the defendants demanded the further sum of $50,000 as a fee or bonus for loaning said money, together with an agreement to pay interest on said $250,000, at the rate of seven per cent per annum (being an increase of one-half of one per cent, the notes and mortgage called for only six and one-half per

cent). The eleventh paragraph sets out that, at the time of the negotiations, the financial condition of the plaintiff was such that it was required to yield to the demands of the defendants to pay the additional sum of $50,000.

The twelfth paragraph of the complaint sets forth that after the defendants had agreed to loan the plaintiff the sum of $250,000, it was agreed that the plaintiff should execute a second mortgage on the property to secure the $50,000, with interest thereon at the rate of seven per cent per annum, and that the plaintiff at that time did execute a note and mortgage for said sum of $50,000 to secure the payment of said sum to the defendants; that this mortgage was executed to the defendants Wm. M. Cook and W. E. Babb, for and on behalf of the defendants, and was assigned by them to the Marine Trust & Savings Bank of Long Beach. The thirteenth paragraph of plaintiff's complaint sets forth the payment of the $250,000, the $50,000 and the interest thereon.

The fourteenth paragraph sets forth that the defendants knowingly and intentionally exacted and demanded of the plaintiff as a bonus and consideration of said loan of $250,000, as aforesaid, that the plaintiff pay the sum of $50,000 and interest thereon, which amounted to the sum of $2,632.21; and that such payments were all made to secure the satisfaction of the notes and mortgage assigned by the Associated Oil Company to the Marine Trust & Savings Bank of Long Beach, as aforesaid. The fifteenth paragraph sets forth, among other things, that payment of said $50,000 and interest thereon was without any consideration, and for the express intent and purpose on the part of the defendants to compel the plaintiff to pay an unlawful and usurious rate of interest for the loan to it by the defendants of said sum of $250,000. After setting forth the detailed amount of interest paid and penalty alleged to be usurious, the plaintiff prays that the same be trebled and sets forth the amount claimed in the sum of $198,021.75.

The findings filed by the trial court are as follows: Findings Nos. 1 and 2 are to the effect that paragraphs 1 and 2 of the amended complaint are true. Findings Nos. 3, 4, 5 and 6 are to the effect that paragraphs 3, 4, 5 and 6 of the plaintiff's complaint are untrue. Finding No. 7 is that all of the allega-

tions of paragraph 7 of plaintiff's complaint are untrue, except that the sum of $272,593.79 was paid by said Marine Trust & Savings Bank of Long Beach to the Associated Oil Company, and that in consideration thereof, the said Associated Oil Company assigned and transferred to said Marine Trust & Savings Bank of Long Beach the notes and mortgage referred to in the complaint. Finding No. 8 is simply that paragraph 8 of plaintiff's complaint, and all the allegations thereof, are untrue. Finding No. 9 is to the effect that all of paragraph 9 of the plaintiff's complaint is untrue, save and execpt that it is true that in the written escrow instructions to the Marine Trust & Savings Bank which was severally executed by the several defendants, said Marine Trust & Savings Bank was authorized and directed to execute a declaration of trust specifying that it held title to the notes and mortgage for the benefit of the several defendants and that it should thereafter issue certificates of beneficial interest to each of the defendants and collect the payments to be made, and as made disburse the same quarterly to the several defendants or their respective assignees. Finding No. 10 is to the effect that all of paragraph 10 of plaintiff's complaint is untrue. Finding No. 11 is simply to the effect that all of paragraph 11 of plaintiff's complaint is untrue. Finding No. 12 is to the effect that all of paragraph 12 of the plaintiff's complaint, save and except that plaintiff did execute a note for the sum of $50,000 and a mortgage on said property to secure the same with interest at the rate of seven per cent per annum to Wm. M. Cook and W. E. Babb as payees thereof, and that said Cook and Babb did assign said note and mortgage to the Marine Trust & Savings Bank as trustee for the several defendants is untrue. Finding No. 13 is to the effect that all of paragraph 13 of plaintiff's complaint is untrue, save and except that prior to the commencement of this action the plaintiff paid to the Marine Trust & Savings Bank of Long Beach as trustee for the several defendants the sum of $250,000, together with interest thereon in the sum of $13,375.12, and, also, the further sum of $50,000, with interest thereon, in the sum of $2,632.21, and that upon the payment of said sums, said notes and mortgage were satisfied and released. Finding No. 14 is to the effect that all of the allegations of para-

graph 14 of plaintiff's complaint are untrue. Finding No. 15 is likewise to the effect that all of the allegations of paragraph 15 of plaintiff's complaint are untrue.

As a conclusion of law from the foregoing findings, the court held that the plaintiff was not entitled to recover anything from the defendants, and judgment was entered accordingly.

The record shows sufficient testimony to justify the finding of the following facts: That prior to the opening of the negotiations involved in this action in 1924, the O. A. Graybeal Company was a corporation, of which Graybeal, Miller and Lindsay comprised the executive officers. The company was at that time the owner of a large tract of land, which it had purchased for the purpose of subdividing and reselling the same in city lots. This land was subject to an existing mortgage which had been executed by George H. Peck, a previous owner, to secure three promissory notes aggregating $267,380. These notes matured as follows: One in October, 1924, one in October, 1925, and one in October, 1926. The notes and mortgage were held by the Associated Oil Company. The notes drew interest at the rate of six and one-half per cent per annum. The mortgage contained no provision requiring the mortgagee to join in subdividing the premises, nor was there any release clause in the mortgage. The appellant had surveyed the land, subdivided it into lots and streets, and had prepared for filing and recordation a map of such subdivision. Up to this time the Associated Oil Company had refused to join in the filing and recording of the map.

Likewise no agreement had been entered into or arrangement made for the release of any of the lots from the mortgage. Appellant, however, had proceeded and sold upon contract lots according to such unrecorded map; the value at which the lots were so sold aggregated about $650,000. Many of the contracts upon such lots had been and were being paid up by the purchasers, who were demanding deeds which appellant was unable to give them because of its inability to record its map and to procure a release of the lots from the mortgage. The real estate commissioner of California was investigating the situation. The urgency was, therefore, very great that someone be found either to loan the money to the appellant with which

to pay off the Peck notes and mortgage, or who would purchase the Peck notes and mortgage and take an assignment thereof from the Associated Oil Company, and, also, to find someone who would join in the immediate filing and recording of the subdivision map and to enter into a plan for the acceptance of partial payments and the release of lots from the lien of the mortgage. In this contingency Graybeal and Miller, and a man by the name of Senter, took up with Cook and Babb, real estate dealers and investment brokers, having an office in Long Beach, the proposition of refinancing.

According to the testimony of Babb and Cook, the proposition was to employ them as agents or brokers to procure a purchaser or purchasers for the Peck notes and mortgage, who would be willing to accept installment payments, agree to the filing and recording of the plat or map of the subdivision and the release of lots. After one or two interviews, Cook stated that they had just completed an arduous season and were about to take their vacations, that the job was a difficult one but if they would "make it easy enough for them, they would undertake it", explaining that by "making it easy enough for them" he would want the sum of $50,000 to handle the deal, that of this sum $2,500 would be paid to Senter, that Babb and Cook would want $10,000 for their commission, and that the remainder of the $50,000, to wit, $37,500 would probably have to be prorated among the purchasers of the Peck notes as an inducement to persuade them to produce such a large sum of money, and to agree to receive back their money "in small dribs", and to join in the subdivision map and the execution of partial releases. To this there is testimony to the effect that Graybeal and Miller stated they would be glad to pay $50,000 for this service, as they expected to make between $750,000 to $800,000 out of the deal. Babb and Cook then asked for time to investigate and proposed that an option be executed giving Babb and Cook time within which to find purchasers for the Peck notes, the option providing for the payment of said sum of $50,000. Some discussion also took place at these conferences as to the extension of time upon the Peck notes, and it appears that an arrangement was made by which Babb and Cook were to advance the necessary sums of money to make payment for

extensions if so requested. No advances of this kind were made, however, by Babb and Cook. The several conferences resulted in the following conclusion: The different defendants mentioned in this action paid to the Marine Trust & Savings Bank of Long Beach the necessary money to make up the $250,000. The plaintiff paid to said bank the additional sum of $22,592.79. These amounts, aggregating $272,592.79, were paid to the Associated Oil Company and the notes and mortgage assigned to the Marine Trust & Savings Bank of Long Beach. Trust agreements and declarations were executed as hereinbefore stated showing that the bank was acting as trustee and agent for the respective parties, to receive payment from the plaintiff and to disburse such payments to the defendants in this action in proportion to their respective interests. In due course of time, as herein stated, the Peck notes and the $50,000 note to Babb and Cook, together with interest at the rate of seven per cent per annum, were paid by the plaintiff to the bank and the bank released the Peck mortgage.

On the part of the appellant, as alleged in its amended complaint, it is claimed that application was made to Babb and Cook for a loan and that the transaction took the form of a purchase of the Peck notes and assignment of the mortgage securing the same simply to evade the provisions of the Initiative Act defining usury.

On the part of the respondents it is insisted that the subject of loan was never mentioned, that it was never considered by any of the defendants, that it was a straight purchase of the Peck notes and assignment of the mortgage securing the same, and that the $50,000 covered by the note and second mortgage given to Babb and Cook assigned to the Marine Trust & Savings Bank was simply a bonus or gratuity to induce them to enter the syndicate formed for purchasing the Babb notes and mortgage and for the agreement to release lots from the lien of the Peck mortgage, as full payments were made thereon by the different purchasers.

The trial court, in its findings, did not directly characterize the transaction as being either a loan or a purchase, did not find whether the Peck notes were discounted, or whether a bonus or gratuity was paid by the plaintiff. All that the trial court did find was that the transaction

did not amount to a loan. In other words, the findings of the trial court are to the effect that the allegations of the plaintiff's amended complaint, in so far as it sets forth a loan, are untrue. While a number of issues are presented to this court for consideration, there is only one vital question, to wit: Was the transaction, so far as the defendants are concerned, a purchase of the Peck notes and mortgage, or was it a loan in the form of a purchase?

The Usury Act to which we have referred fixes a penalty only to a loan or forbearance of money, etc. There is no pretense in this case that there was any forbearance. The word "forbearance" means, according to 26 C. J. 794, "to abstain or desist from; to give up, a term which is equivalent to 'wait'" when used in reference to a debt. In other words, it would mean a waiting to collect a debt or to agree not to insist upon payment at the date of maturity of the debt or to give further time. Nothing of that kind appears in this case, so it may not be further mentioned. The word "loan" as defined in 38 C. J., page 126, ordinarily means the following: "A contract by which one delivers a sum of money to another and the latter agrees to return at a future time a sum equivalent to that which he borrows; the delivery by one party and the receipt by the other party of a given sum of money, upon an agreement, express or implied, to repay the sum loaned, with or without interest." If such is the intent of the parties, the transaction will be considered a loan without regard to its form.

When the form of the transaction does not show a loan, and, therefore, does not explicitly exhibit a violation of the Usury Law, the question of intent becomes material. Thus the note found in Ann. Cas. 1913C, page 1327, is pertinent: "There are two cardinal rules in the doctrine of usury, 'said the court in Nichols v. Fearson, 7 Pet. (U. S.) 103 [8 L. Ed. 623, see, also, Rose's U. S. Notes]', which we think must be regarded as the commonplace to which all reasoning and adjudication upon the subject should be referred. The first is that, to constitute usury there must be a loan in contemplation by the parties; and the second, that a contract which in its inception is unaffected by usury can never be invalidated by any subsequent usurious transaction." It is then said that when a thing is valid

in its inception, the fact "that a promissory note which is sold at a discount exceeding the lawful rate of interest is endorsed by the seller does not make the transaction usurious, if the sale is made *bona fide*, and not as a cover for a loan". In 39 Cyc., page 922, the rule relating to the subject of intention, supported by a long list of authorities, is thus set forth: "But when a contract is honest on its face, proof of the existence of a corrupt intention to evade the usury laws is important as showing that the transaction is really a cloak to disguise usurious dealing, just as good faith and absence of such a corrupt intent will justify the court in upholding a transaction suspicious on its face," and on page 1057 and 1058 of the same volume, we find the text likewise supported by a number of authorities, reading as follows: "When a transaction honest in form is alleged to be a mere cloak to cover usury, the existence of the corrupt usurious intent behind the device is a question for the jury. . . . It is for the jury to determine whether a usurious purpose lurks behind what purports to be a sale of property, or a note legal on its face but given for a larger sum than was actually advanced upon it, or commissions purporting to be paid to the lender or his agent for services rendered or expenses incurred in connection with the loan," and, as stated in the text, "it is only when there is no dispute as to the facts, the question whether such facts constitute usury is a question of law to be determined by the courts". To the same effect is the text found in 27 Ruling Case Law, pages 211 and 212.

The rule is likewise well established, and set forth in *Houghton* v. *Burden*, 228 U. S. 161 [57 L. Ed. 780, 33 Sup. Ct. Rep. 491, see, also, Rose's U. S. Notes], to wit: "The defense of usury to a suit upon a contract fair on its face must be established by clear and satisfactory evidence." This rule is likewise applied to the proofs necessary to be made by plaintiff when prosecuting an action for the recovery of a penalty under the usury laws.

A few minor objections raised by the respondents affecting the right of the plaintiff to maintain this action may be here considered. The first objection is that the complaint does not set forth facts sufficient to constitute a cause of action. The clerk's record fails to disclose that there was any demurrer filed to the plaintiff's amended complaint. In

behalf of this objection, it is urged by the respondents that no date is set forth as to the maturity of the three notes held and owned by the Associated Oil Company and assigned to the Marine Trust & Savings Bank. The record, however, establishes these facts: No special demurrer was directed, as we have said, to this technical deficiency in the amended complaint. ■ Assuming that the amended complaint was defective in this particular, it was an abuse of discretion on the part of the trial court to refuse to permit the plaintiff to file an amendment to its complaint conforming to the proofs. An examination of the proposed amendment to the plaintiff's complaint shows that the dates of maturity of the notes were specifically set forth.

■ It is likewise objected that the testimony does not show payment of the notes and the interest thereon to the defendants in this case. The agreement which we have hereinbefore referred to executed by the respective parties name the bank as a trustee to hold the notes for and on behalf of the defendants. The trustee was authorized to receive payments and cancel the notes and mortgage, and as payments were made from time to time, to distribute such payments to the respective defendants, according to their interests. This agreement constituted, in law, the bank the agent to receive payment for and on behalf of the defendants. It can hardly be questioned that when the principal appoints an agent and authorizes him to receive payment for and on behalf of the principal, that payment has been made to the principal as a matter of law, when made to the agent.

■ It is likewise urged by the respondents that the Usury Law does not apply to corporate borrowers, and in support of this contention, the case of *In re Washer,* 200 Cal. 598 [254 Pac. 951], is cited. A reading of this case clearly demonstrates that this contention is untenable. We are not dealing with any note issued and sold by any corporate power. The provisions in the Usury Law relative to the issuance and sale of corporate securities are not involved in this case and the contention of the respondents in this particular appears to be entirely without merit.

■ Likewise presented for our consideration is the minor subject of the guaranty called for in the agreements and executed on behalf of the plaintiff guaranteeing the payment of the three notes assigned by the Associated Oil Company

to the Marine Trust & Savings Bank. On the part of the appellant three cases are cited which support the rule that when notes are transferred under circumstances similar to those presented here, and a guaranty of payment is demanded and executed,. that the transaction takes on the character of and is therefore held in law to be a loan. Supporting this rule are the cases of *Campbell* v. *Reed,* Mart. & Y. (Tenn.) 392 and others noted. However, this case appears to be overruled by the case of *Cantrell* v. *Ford,* (Tenn. Ch. App.) 46 S. W. 581. In *Cowles* v. *McVickar,* 3 Wis. 725, the rule contended for by the appellant is upheld. Likewise in *Sedbury* v. *Duffy,* 158 N. C. 432 [74 S. E. 355], the giving of a guaranty is held to transmute the transaction into a loan. All the other cases cited by the appellant are really contrary to the rule contended for.

As opposed to the three cases supporting the appellant's contention, the authorities are so numerous as to preclude their citation. These authorities generally follow the rule as found in *Lloyd* v. *Keach,* 2 Conn. 175 [7 Am. Dec. 256, 257], and approved in *Belden* v. *Lamb,* 17 Conn. 441, *Brittin* v. *Freeman,* 2 Harr. (17 N. J. L.) 191, *Cram* v. *Hendricks,* 7 Wend. (N. Y.) 569, *Nichols* v. *Fearson,* 7 Pet. (U. S.) 103 [8 L. Ed. 623, see, also, Rose's U. S. Notes], and *Dickerman* v. *Day,* 31 Iowa, 444 [7 Am. Rep. 156], that the giving of a guaranty is simply an item of testimony or evidence which the trial court may consider in determining whether the transaction is in fact a loan, or, what it purports to be, a purchase and sale of a negotiable instrument. ▆
In this connection, it is urged by the respondents that the instrument executed as and purporting to be a guaranty of payment of the Peck notes is defective, and is not an instrument capable of being enforced. As bearing upon the question of intent, we do not very well see how any technical insufficiency of the instrument executed as a guaranty can be considered and determined upon this appeal, or how it could be determined by the trial court in the trial of this action. As bearing upon the question of intent, and in determining what the court should hold the transaction to be, a guaranty would have exactly the same effect even though its technical legal sufficiency might be open to question.

▆ As we view the circumstances presented upon this appeal, there is but one crucial question, to wit: Does the

evidence support the finding of the court that the transaction was not a loan? As we have heretofore stated, there is no finding in specific language that the transaction was a purchase and sale of the Peck notes. The finding is simply to the effect that the allegations of the complaint that the transaction was a loan are untrue. If the testimony of the appellants' witnesses, taken in connection with the surrounding circumstances of the transaction, the apparent fact that the bonus or fee exacted by Babb and Cook to make the negotiations "easy", and the division of $37,500 among the several defendants, according to their interests in the syndicate formed to take over the Peck notes, as a guaranty or bonus for the putting up of the money to take over the Peck loan be weighed in the balance, and the finding made by the trial court that the transaction was really a loan, and was taken in the form of a purchase and sale as a covert contrivance to evade the provisions of the Usury Law, it cannot very well be denied that such a finding would have been well supported by the testimony set forth in the record in this case. On the other hand, if the testimony introduced on the part of the plaintiff be disregarded and set aside, and the testimony on the part of the defendants and given by the defendants, when examined by the plaintiff under the provisions of section 2055 of the Code of Civil Procedure, be accepted as a true version of the transaction, then, and in that case, we think the record shows sufficient testimony to support the finding of the court that the transaction was not a loan.

A large number of authorities have been cited by respective counsel to the effect that the holder or owner of a negotiable instrument may sell and discount the same for any sum or price he may be willing to accept, and though it gives to the purchaser a rate of interest largely in excess of twelve per cent per annum, the transaction is not usurious; that is, when a negotiable instrument has been given legal inception, its sale and purchase is subject to the law relating to the sale of ordinary personal property, that is, the seller may sell for what he is willing to take and the purchaser may buy for the least sum the seller will accept. In this case, however, there is no question of discount. The Associated Oil Company received full payment for the three notes.

The testimony of Cook and Babb is to the effect that the only subject ever discussed was that of sale and purchase of the Peck notes and mortgage, that the subject of loan was not mentioned.

Mr. Craig, one of the defendants, testified substantially as follows: "Q. What was said at that conversation? A. He told me that he wanted to raise $250,000 to buy a mortgage, and told me what the mortgage was. Q. What did he say about the mortgage? A. He said it was a mortgage that was backing up some notes of Mr. Peck's on land on Western avenue, and he said there was a $50,000—he said that the parties owning the land could not get releases; the mortgage was held by the oil company and they would not give partial releases, and he had to have releases because he had sold lots, and they were getting paid up, and he had to produce his deeds, and that if we bought the mortgage he was willing to pay a $50,000 bonus for getting the release of these lots in small portions—release of small amounts of land as he sold the lots. Q. Was the subject of loaning any money to the owner of that land discussed by you or Mr. Cook in that conversation? A. The only thing discussed with me was buying this mortgage." The witness further testified that the only intent he had in the matter was to buy the Peck notes and mortgage. The witness further testified that he understood there was to be a payment for the release of the lots, that he was told the bonus amounted to $50,000, that he understood Babb and Cook were to retain the sum of $12,500.

The defendant Bixby testified that he had never seen Mr. Graybeal until he saw him in the courtroom, and then testified as follows: "Q. Referring to the time of the transaction, at that time was this transaction ever mentioned to you in the form of making a loan to the O. A. Graybeal Company, or any other corporation, upon the land? A. No, it was simply us going in with others and buying the mortgage." The witness Bixby further testified: "This mortgage, the Peck mortgage, was to be purchased; that the purchasers were to agree to give partial releases as requested by the O. A. Graybeal Company upon a schedule to be arranged; that $50,000 was to be paid for granting—extending this privilege of releasing—making partial releases, and that the $50,000 was to be secured by a second mortgage, and when

a lot was to be released from the first mortgage it was also to be released from the second mortgage on certain payments."

The witness Babb testified that the subject of making a loan to the Graybeal Company was not discussed. His version is as follows: "They came into our office by appointment. They said they had—what I mean by that, I don't know which one said it on their side in particular—but they said they had bought a tract of land up there that had a mortgage on it and sold lots in which they could not get satisfactory releases from the parties holding the mortgage, and wanted to know if we could get someone or several persons who would participate in the purchase of the mortgage and would give them partial releases. We told them what we would handle the proposition for, to-wit: the sum of $50,000."

Cook and Babb both denied the testimony introduced by Graybeal to the effect that during the conversations relative to the negotiations it was stated that it should be put in such a form as to escape the usury laws, or, as worded by the witness, "to make that part legal which in law was illegal", or to "legitimize an illegitimate transaction".

The testimony of Cook was to the effect that Graybeal and Miller came to him and asked him to handle the transaction, to find purchasers for the Peck notes and that he would handle the transaction for the sum of $50,000. The language of the witness, as set forth in the supplement, is as follows: "I said to them that I was leaving on my vacation on the 19th of July, and that it was a very short period in which to accomplish the transaction they were asking me to accomplish, but if they wanted to make it easy enough for me to do it, or for us to do it, that we would look into the thing and see whether we could recommend it or not. Up to that time we had not seen the property and knew nothing of its value except what they had told us. One or the other of them asked me what I meant by 'making it easy enough', and I told them that it would cost them $50,000. I told them $2,500 would be for Mr. Senter. I told Miller and Graybeal that we would want $10,000 as a fee for our efforts in the enterprise and that the balance of $37,500 would be used in payment to those who would invest in the mortgage in consideration of their taking their

money back in small dribs from time to time and granting the partial releases on rather favorable terms. . . . One or the other of them said 'that is all right. We are making $750,000 or $800,000 in this deal, and we are glad to pay the $50,000 to get it in the shape we want to'.''

Without going into the testimony in further detail or set it out in this opinion, it is sufficient to say that the testimony of all of the defendants is to the effect that the $50,-000 exacted as a fee by Babb and Cook, after deducting the sum of $12,500, was distributed among the defendants in proportion to their contribution to the general fund necessary to buy the Peck notes and mortgage, as a bonus for making the purchase. The testimony, in relation to the release of the respective lots as they were paid off by purchasers, establishes the fact that partial payments were to be made upon the notes from time to time, as purchasers of lots made their payments. The testimony also shows that the costs of executing the releases were otherwise provided for, which costs were, in fact, only nominal.

▮▮ Having been found by the court not to be a loan, is it permissible for one against whose land there exists an indebtedness evidenced by promissory notes secured by mortgage, to offer to or pay a bonus or gratuity to a purchaser in order to induce him to purchase a certain note or notes and mortgage, and agree to perform services not provided for in the original mortgage, such as the release of a portion of the mortgaged premises from time to time? Upon this question the authorities are almost negligible.

The only cases called to our attention bearing upon this subject are the following, and a diligent search fails to disclose any others. In *Siewert* v. *Hamel et al.*, 91 N. Y. 199, the holding of the court is as follows: (We quote for convenience from the syllabus.) "The purchase of a debt by one at the instance of the debtor for less than its face, the debtor himself with the knowledge of the purchaser paying the creditor the discount, is not *per se* usury. It must be made to appear that the transaction originated in an agreement for a loan, as there can be no usury disconnected with a loan." In the case at bar, the Peck notes and mortgage are entirely free from any imputation of usury. (See, also, *Lesley* v. *Johnson*, 41 Barb. (N. Y.) 359; also, *Donnington* v. *Meeker*, 3 Stockt. (11 N. J. Eq.) 362.)

The law is well settled that the defendants in this case, had the Associated Oil Company been willing, could have purchased the Peck notes at a discount, irrespective of the amount of money earned by them through such a transaction. This being true, we do not well perceive how it could be held upon this appeal, in face of the finding of the court that the transaction was not a loan, that the mere payment of a bonus or gratuity on the part of the appellant to the defendants, in order to induce them to purchase the notes and mortgage, can be held to be a violation of the Usury Law to which we have referred.

Another contention is made by the appellant not heretofore considered, to wit: That a number of allegations of the plaintiff's amended complaint found to be untrue by the court are true in fact and established by uncontradicted evidence and, therefore, that the judgment should be reversed. This, however, is not a tenable position. If the judgment rests upon a finding supported by sufficient testimony, and the only finding necessary to support the judgment, the fact that there are other findings not supported by the testimony becomes immaterial. As stated in *Thayer* v. *Tyler,* 169 Cal. 671, 673 [147 Pac. 979, 980], "it is only when a judgment *rests for its validity* upon a finding which is not supported or which negatives a fact admitted by the pleadings, that injury is worked and a reversal must follow", citing a number of cases.

Only one finding in this case is absolutely necessary for the support of the judgment, to wit: That the transaction was not a loan. This the court has found. The finding of the trial court against the contention of the appellant upon conflicting testimony is binding upon appeal. Had the court found the transaction to be a loan, a simple computation would show its usurious character, and if we were to agree that the evidence preponderates in favor of its contention, we would not be justified in setting aside the findings of the trial court and drawing findings of our own, based upon the appellant's testimony, as contended by it, under the provisions of section 956a of the Code of Civil Procedure.

The judgment is affirmed.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 5, 1931, and a petition

by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 2, 1931.